FALBO *v.* UNITED STATES.

No. 73.   Argued November 19, 1943.—Decided January 3, 1944.

*Mr. Hayden C. Covington,* with whom *Mr. Victor F. Schmidt* was on the brief, for petitioner.

*Solicitor General Fahy,* with whom *Assistant Attorney General Tom C. Clark,* and *Messrs. Robert S. Erdahl* and *Valentine Brookes* were on the brief, for the United States.

*Messrs. Julien Cornell, Harold Evans, Ernest Angell,* and *Osmond K. Fraenkel* filed a brief on behalf of the National Committee on Conscientious Objectors of the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner was indicted on November 12, 1942, in a federal District Court in Pennsylvania for knowingly failing to perform a duty required of him under the Selec-

tive Training and Service Act of 1940.[1] The particular charge was that, after his local board had classified him as a conscientious objector, he wilfully failed to obey the board's order to report for assignment to work of national importance.[2] Admitting that his refusal to obey the order was wilful, petitioner defended his conduct on the ground that he was entitled to a statutory exemption from all forms of national service, since the facts he had presented to the board showed that he was a "regular or duly ordained" minister.[3] The Act, he argued, does not make it a crime to refuse to obey an order to report for service if that order is based upon an erroneous classification, because there is no "duty" to comply with a mistaken order. This defense was seasonably urged but the District Court declined to recognize it, expressing the view that, "the Board has the decision of whether or not this man is to be listed as he claims he should be"; and at the

---

[1] 54 Stat. 885; 50 U. S. C. Appendix §§ 301–318. Section 11 imposes criminal sanctions for wilful failure or neglect to perform any duty required by the Act or by rules or regulations made pursuant to the Act.

[2] Under § 5 (g) of the Act, a registrant who "by reason of religious training and belief" is conscientiously opposed to participation in war may be inducted into the land or naval forces but must be assigned to noncombatant service as defined by the President. If for similar reasons a registrant is conscientiously opposed even to participation in noncombatant service he is not to be inducted into the armed forces at all but·"shall . . . be assigned to work of national importance under civilian direction." Regulations, not here challenged, impose on selectees a duty to obey board orders to report for induction or assignment.

[3] Section 5 (d) of the Act provides in part: "Regular or duly ordained ministers of religion . . . shall be exempt from training and service (but not from registration) under this Act." The local board refused to find that petitioner was a minister and further declined to classify him as a conscientious objector. Upon review a board of appeal, set up under § 10 (a) (2), sustained the local board's refusal to exempt petitioner as a minister, but directed that he be classified as a conscientious objector.

conclusion of the trial the jury was charged that, "if you find from the facts that he failed to report—and there is no evidence to the contrary . . .—it would be your duty to find him guilty." The result of the trial was a conviction and sentence to imprisonment for five years.

On appeal petitioner urged that the District Court had erred in refusing to permit a trial de novo on the merits of his claimed exemption. In the alternative, he argued that at least the Court should have reviewed the classification order to ascertain whether the local board had been "prejudicial, unfair, and arbitrary" in that it had failed to admit certain evidence which he offered, had acted on the basis of an antipathy to the religious sect of which he is a member, and had refused to classify him as a minister against the overwhelming weight of the evidence. The Circuit Court of Appeals affirmed the District Court per curiam, 135 F. 2d 464. We granted certiorari because of the importance of the problems involved relating to administration of the Selective Training and Service Act of 1940, upon which problems the Circuit Courts of Appeals have not expressed uniform views.[4]

When the Selective Training and Service Act was passed in September, 1940, most of the world was at war. The preamble of the Act declared it "imperative to increase and train the personnel of the armed forces of the United States." The danger of attack by our present enemies, if not imminent, was real, as subsequent events have grimly demonstrated. The Congress was faced with the urgent necessity of integrating all the nation's people and forces for national defense. That dire consequences might flow from apathy and delay was well understood. Accordingly the Act was passed to mobilize national manpower with

---

[4] See, for example, *Goff* v. *United States*, 135 F. 2d 610, 612 (C. C. A. 4); *Rase* v. *United States*, 129 F. 2d 204, 207 (C. C. A. 6); *Ex parte Catanzaro*, 138 F. 2d 100, 101 (C. C. A. 3); *United States* v. *Kauten*, 133 F. 2d 703, 706, 707 (C. C. A. 2); *United States* v *Grieme*, 128 F. 2d 811, 814, 815 (C. C. A. 3).

the speed which that necessity and understanding required.

The mobilization system which Congress established by the Act is designed to operate as one continuous process for the selection of men for national service. Under the system, different agencies are entrusted with different functions but the work of each is integrated with that of the others. Selection of registrants for service, and deferments or exemptions from service, are to be effected within the framework of this machinery as implemented by rules and regulations prescribed by the President.[5] The selective service process begins with registration with a local board composed of local citizens. The registrant then supplies certain information on a questionnaire furnished by the board. On the basis of that information and, where appropriate, a physical examination, the board classifies him in accordance with standards contained in the Act and the Selective Service Regulations. It then notifies him of his classification. The registrant may contest his classification by a personal appearance before the local board, and if that board refuses to alter the classification, by carrying his case to a board of appeal,[6] and thence, in certain circumstances, to the President.

---

[5] Section 10 (a) (2) of the Act provides in part that ". . . local boards, under rules and regulations prescribed by the President, shall have power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this Act of all individuals within the jurisdiction of such local boards. The decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe." Pursuant to the grant of authority conferred by the Act the President, through appropriate executive agencies, has promulgated and from time to time amended comprehensive Selective Service Regulations.

[6] A registrant may not, however, appeal from the determination of his physical or mental condition. Selective Service Regulations, § 627.2 (a).

Only after he has exhausted this procedure is a protesting registrant ordered to report for service. If he has been classified for military service, his local board orders him to report for induction into the armed forces. If he has been classified a conscientious objector opposed to noncombatant military service, as was petitioner, he ultimately is ordered by the local board to report for work of national importance. In each case the registrant is under the same obligation to obey the order. But in neither case is the order to report the equivalent of acceptance for service. Completion of the functions of the local boards and appellate agencies, important as are these functions, is not the end of the selective service process. The selectee may still be rejected at the induction center and the conscientious objector who is opposed to noncombatant duty may be rejected at the civilian public service camp.[7] The connected series of steps into the national service which begins with registration with the local board does not end until the registrant is accepted by the army, navy, or civilian public service camp. Thus a board order to report is no more than a necessary intermediate step in a united and continuous process designed to raise an army speedily and efficiently.

In this process the local board is charged in the first instance with the duty to make the classification of registrants which Congress in its complete discretion[8] saw fit

[7] Section 3 (a) of the Act provides in part that ". . . no man shall be inducted for training and service under this Act unless and until he is acceptable to the land or naval forces for such training and service and his physical and mental fitness for such training and service has been satisfactorily determined: . . ." We are informed by the government that pursuant to this section approximately forty per cent of the selectees who report under orders of local boards for induction into the armed forces are rejected, and that, as of October 15, 1943, six hundred and ten of the eight thousand selectees who had reported for civilian work of national importance had been rejected.

[8] See *Hamilton* v. *Regents,* concurring opinion, 293 U. S. 245, 265, 266–268; see also *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29; *Mac-*

to authorize. Even if there were, as the petitioner argues, a constitutional requirement that judicial review must be available to test the validity of the decision of the local board, it is certain that Congress was not required to provide for judicial intervention before final acceptance of an individual for national service. The narrow question therefore presented by this case is whether Congress has authorized judicial review of the propriety of a board's classification in a criminal prosecution for wilful violation of an order directing a registrant to report for the last step in the selective process.

We think it has not. The Act nowhere explicitly provides for such review and we have found nothing in its legislative history which indicates an intention to afford it. The circumstances under which the Act was adopted lend no support to a view which would allow litigious interruption of the process of selection which Congress created. To meet the need which it felt for mobilizing national manpower in the shortest practicable period, Congress established a machinery which it deemed efficient for inducting great numbers of men into the armed forces. Careful provision was made for fair administration of the Act's policies within the framework of the selective service process. But Congress apparently regarded "a prompt and unhesitating obedience to orders" issued in that process "indispensable to the complete attainment of the object" of national defense. *Martin* v. *Mott,* 12 Wheat. 19, 30. Surely if Congress had intended to authorize interference with that process by intermediate challenges of orders to report, it would have said so.

Against this background the complete absence of any provision for such challenges in the very section providing for prosecution of violations in the civil courts permits no

*intosh* v. *United States,* 42 F. 2d 845, 847, 848; 283 U. S. 605, dissenting opinion, 627, 632; *United States* v. *Bethlehem Steel Corp.,* 315 U. S. 289, 305.

other inference than that Congress did not intend they could be made. The instant case offers a striking example of the consequences of any other view. Petitioner, 25 years of age, unmarried, and apparently in good health, registered with his local board on October 16, 1940. He claimed exemption August 23, 1941. Consideration of his claim by the local board and the board of appeal delayed his classification, so that his final order to report was not issued until September 2, 1942. Today, one year and four months after this order, he is still litigating the question.

*Affirmed.*

Mr. Justice Rutledge, concurring:

I concur in the result and in the opinion of the Court except in one respect. Petitioner claims the local board's order of classification was invalid because that board refused to classify petitioner as a minister on the basis of an antipathy to the religious sect of which he is a member. And, if the question were open, the record discloses that some evidence tendered to sustain this charge was excluded in the trial court. But petitioner has made no such charge concerning the action of the appeal board which reviewed and affirmed the local board's order. And there is nothing to show that the appeal board acted otherwise than according to law. If therefore the local board's order was invalid originally for the reason claimed, as to which I express no opinion, whatever defect may have existed was cured by the appeal board's action. Apart from some challenge upon constitutional grounds, I have no doubt that Congress could and did exclude judicial review of Selective Service orders like that in question. Accordingly I agree that the conviction must be sustained.

Mr. Justice Murphy, dissenting:

This case presents another aspect of the perplexing problem of reconciling basic principles of justice with mili-

tary needs in wartime. Individual rights have been recognized by our jurisprudence only after long and costly struggles. They should not be struck down by anything less than the gravest necessity. We assent to their temporary suspension only to the extent that they constitute a clear and present danger to the effective prosecution of the war and only as a means of preserving those rights undiminished for ourselves and future generations. Before giving such an assent, therefore, we should be convinced of the existence of a reasonable necessity and be satisfied that the suspension is in accordance with the legislative intention.

The immediate issue is whether the Selective Training and Service Act of 1940 must be interpreted so as to deprive alleged violators of the right to a full hearing and of the right to present every reasonable defense. Petitioner, a member of Jehovah's Witnesses, claimed to be a minister exempt from both military training and civilian work under the Act. After exhausting all the administrative remedies and appeals afforded by the Act, he was classified as a conscientious objector (Class IV–E) rather than as a minister (Class IV–D). Petitioner alleges that this classification was contrary to law and was the result of arbitrary action by his local board. On the assumption that these allegations are true, the subsequent order to report for assignment to work of national importance, which he disobeyed, must therefore be considered invalid. Our problem is simply whether petitioner can introduce evidence to that effect as a defense to a criminal prosecution for failure to obey the order.

Common sense and justice dictate that a citizen accused of a crime should have the fullest hearing possible, plus the opportunity to present every reasonable defense. Only an unenlightened jurisprudence condemns an individual without according him those rights. Such a denial is especially oppressive where a full hearing might dis-

close that the administrative action underlying the prosecution is the product of excess wartime emotions. Experience demonstrates that in time of war individual liberties cannot always be entrusted safely to uncontrolled administrative discretion. Illustrative of this proposition is the remark attributed to one of the members of petitioner's local board to the effect that "I do not have any damned use for Jehovah's Witnesses." The presumption against foreclosing the defense of illegal and arbitrary administrative action is therefore strong. Only the clearest statutory language or an unmistakable threat to the public safety can justify a court in shutting the door to such a defense. Because I am convinced that neither the Selective Training and Service Act of 1940 nor the war effort compels the result reached by the majority of this Court, I am forced to dissent.

It is evident that there is no explicit provision in the Act permitting the raising of this particular defense and that the legislative history is silent on the matter. Suffice it to say, however, that nothing in the statute or in its legislative record proscribes this defense or warrants the conviction of petitioner without benefit of a full hearing. Judicial protection of an individual against arbitrary and illegal administrative action does not depend upon the presence or absence of express statutory authorization. The power to administer complete justice and to consider all reasonable pleas and defenses must be presumed in the absence of legislation to the contrary.[1]

Moreover, the structure of the Act is entirely consistent with judicial review of induction orders in criminal proceedings. As the majority states, the Act is designed "to

---

[1] Otherwise the absence of clear statutory permission would preclude court review of induction orders in habeas corpus proceedings following actual induction, a result which this Court's opinion presumably does not intend to infer. Judicial review in such proceedings has become well settled in lower federal courts.

operate as one continuous process for the selection of men for national service," and it is desirable that this process be free from "litigious interruption." But we are faced here with a complete and permanent interruption springing not from any affirmative judicial intervention but from a failure to obey an order. A criminal proceeding before a court is therefore inevitable and the only problem is the availability of a particular defense in that proceeding. Hence judicial review at this stage has none of the elements of a "litigious interruption" of the administrative process.

No other barriers to judicial review of the induction order in a criminal proceeding are revealed by the structure of the Act. The "continuous process" of selection is unique, unlike any ordinary administrative proceeding. Normal concepts of administrative law are foreign to this setting. Thus rules preventing judicial review of interlocutory administrative orders and requiring exhaustion of the administrative process have no application here. Those rules are based upon the unnecessary inconvenience which the administrative agency would suffer if its proceedings were interrupted by premature judicial intervention. But since the administrative process has already come to a final ending, the reason for applying such rules no longer exists. And even if the order in this case were considered interlocutory rather than final, which is highly questionable, judicial review at this point is no less necessary. Criminal punishment for disobedience of an arbitrary and invalid order is objectionable regardless of whether the order be interlocutory or final.

Nor do familiar doctrines of the exclusiveness of statutory remedies have any relevance here. Had Congress created a statutory judicial review procedure prior to or following induction, the failure to take advantage of such a review or the judicial approval of the induction order upon appeal might bar a collateral attack on the order in

a criminal proceeding. But Congress has erected no such system of judicial review. Courts are left to their own devices in fashioning whatever review they deem just and necessary.

Thus there is no express or implied barrier to the raising of this defense or to the granting of a full judicial review of induction orders in criminal proceedings. Courts have not hesitated to make such review available in habeas corpus proceedings following induction despite the absence of express statutory authorization. Where, as here, induction will never occur and the habeas corpus procedure is unavailable, judicial review in a criminal proceeding becomes imperative if petitioner is to be given any protection against arbitrary and invalid administrative action.[2] It is significant that in analogous situations in the past, although without passing upon the precise issue, we have supplied such a necessary review in criminal proceedings. Cf. *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177; McAllister, "Statutory Roads to Review of Federal Administrative Orders," 28 California L. Rev. 129, 165, 166. See also *Fire Department* v. *Gilmour*, 149 N. Y. 453, 44 N. E. 177; *People* v. *McCoy*, 125 Ill. 289, 17 N. E. 786.

Finally, the effective prosecution of the war in no way demands that petitioner be denied a full hearing in this case. We are concerned with a speedy and effective

---

[2] Judge Robert C. Bell of the federal district court in Minnesota, in his article "Selective Service and the Courts," 28 A. B. A. Journal 164, 167, states, "The courts are likely to be confronted with the question of what can be presented as a defense by a selectee in a criminal prosecution against him for a violation of the provisions of the Act of 1940. It appears that this question has not been decided. On principle, it would seem that the defendant should be permitted to offer as a defense the same questions that he could present in a habeas corpus proceeding, that is, the question of whether the board had jurisdiction, whether there was a fair hearing, or whether the action of the board was arbitrary or unlawful."

mobilization of armed forces. But that mobilization is neither impeded nor augmented by the availability of judicial review of local board orders in criminal proceedings. In the rare case where the accused person can prove the arbitrary and illegal nature of the administrative action, the induction order should never have been issued and the armed forces are deprived of no one who should have been inducted. And where the defendant is unable to prove such a defense or where, pursuant to this Court's opinion, he is forbidden even to assert this defense, the prison rather than the Army or Navy is the recipient of his presence. Thus the military strength of this nation gains naught by the denial of judicial review in this instance.

To say that the availability of such a review would encourage disobedience of induction orders, or that denial of a review would have a deterrent effect, is neither demonstrable nor realistic. There is no evidence that petitioner failed to obey the local board order because of a belief that he could secure a judicial reversal of the order and thus escape the duty to defend his country. Those who seek such a review are invariably those whose conscientious or religious scruples would prevent them from reporting for induction regardless of the availability of this defense. And I am not aware that disobedience has multiplied in the Fourth Circuit, where this defense has been allowed. *Baxley* v. *United States,* 134 F. 2d 998; *Goff* v. *United States,* 135 F. 2d 610. Moreover, English courts under identical circumstances during the last war unhesitatingly provided a full hearing and reviewed orders to report for permanent service. *Offord* v. *Hiscock,* 86 L. J. K. B. 941; *Hawkes* v. *Moxey,* 86 L. J. K. B. 1530. Yet that did not noticeably impede the efficiency or speed of England's mustering of an adequate military force.

That an individual should languish in prison for five years without being accorded the opportunity of proving

that the prosecution was based upon arbitrary and illegal administrative action is not in keeping with the high standards of our judicial system. Especially is this so where neither public necessity nor rule of law or statute leads inexorably to such a harsh result. The law knows no finer hour than when it cuts through formal concepts and transitory emotions to protect unpopular citizens against discrimination and persecution. I can perceive no other course for the law to take in this case.