668

UNITED STATES ex rel. HOCE v. McGINNIS, U. S. Marshal.
Civil Action No. 405.

District Court, S. D., West Virginia,
at Charleston.
Aug. 29, 1944.

Horace S. Meldahl, of Charleston, W. Va., for petitioner.

Leslie E. Given, U.S. Atty., of Charleston, W. Va., for respondent.

MOORE, District Judge.

In the volume of litigation incident to the enforcement of the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix, § 301 et seq., the name of Jehovah's Witnesses is writ large and encountered often. The Witnesses are an ultra and uncompromising religious sect whose members profess allegiance to a visionary heavenly kingdom and disclaim all duties of citizenship which they deem in conflict with such heavenly allegiance. In the utmost good faith they unhesitatingly choose to suffer whatever penalties the law may impose rather than to abate one jot or tittle their zealously held doctrine of primary responsibility to the super-mundane sovereignty which they consider themselves bound to serve. In short, they are religious zealots, possessing in ample measure the qualities which have ever characterized those who devote themselves wholly to theological abstractions to the exclusion of all regard for the practical affairs of life and the duties of citizenship.

Courts have been prompt to vindicate the Constitutional rights of Jehovah's Witnesses to freedom of speech and of religion whenever these have been called in question; but they have been equally careful to point out and enforce the superior obligation resting upon these sectaries, in common with all other citizens, to bear arms in defense of their country if required to do so. The Witnesses lay the flattering unction of the vindication suavely to their souls, but recognize the obligation with great reluctance, if at all.

In enacting the Selective Training and Service Law of 1940, Congress saw fit to provide for certain exemptions from military service, vesting in the several draft boards the responsibility of determining questions of qualification for exemption. Among the persons entitled to exemption are ministers of religion. Petitioner here claims that he is a minister of religion and says that his draft board arbitrarily denied him classification as such.

Petitioner is a young man twenty-two years of age. While still a student in high school several years ago, he began, he says, to serve as a "minister" of Jehovah's Witnesses, devoting a minimum of sixty hours each month to that service. In the summer of 1941, he increased this to one hundred and fifty hours per month and thereafter gave his full time to the work of his "ministry" with the exception of one month in 1943 when, in order to eke out his earnings, he worked at private employment during the hours from midnight to eight o'clock A.M. During this time, however, he continued to devote the minimum of one hundred and fifty hours to his "ministerial" work. He says that one out of every five of Jehovah's Witnesses is a minister. He also says that their congregations are composed not of their own mem-

bers, as is the case among orthodox churches, but of all persons living within the area which the particular minister serves. The nature of the "ministerial" work consists in going from house to house within this area, distributing pamphlets published by the Watch Tower Bible and Tract Society, their governing body, playing hortatory phonograph records, and spreading to all who will listen the peculiar doctrines which they seek to propagate.

Petitioner registered under the Selective Training and Service Law, giving his occupation as "Minister of the Gospel." His questionnaire, when filed, as well as his occupational questionnaire, contained the same information. In his questionnaire, he gave as a brief statement of his duties, "Organizing and conducting Bible studies" and in the occupational questionnaire, "Organizing and establishing churches and generally preaching the Gospel of God's Kingdom." He requested the classification of 4-D, that is, ministerial exemption, and made the following statement in support of his request: "I declare myself to be a follower of Christ Jesus and wholly consecrated to do God's will. My entire time is devoted to ministry and evangelistic service, in organizing and establishing churches in definitely assigned territory."

The local draft board which considered petitioner's case, having before it no evidence that petitioner was not a minister of religion other than a letter from petitioner's ex-employer to the effect that he had been secularly employed, the fact that petitioner's name was not on a certified list of ministers of Jehovah's Witnesses (which list had formerly been furnished to local draft boards by the governing body of that society, but had then been discontinued), and the record of petitioner's tender age as shown on his questionnaire, classified him in Class 1-A. Petitioner appealed to the Appeal Board, which unanimously approved the classification of 1-A.

Petitioner was ordered by his local draft board to report for induction on May 12, 1944. Because of his personal conviction that he had been erroneously classified, in that he felt he was entitled to ministerial status and consequent exemption, petitioner was resolute that he would not submit to induction. However, he wished to take every step in obeying the Board's order short of induction into the armed forces, having been advised by his counsel that he would then have the right, in case of his arrest before taking the final step of sub-

mitting to induction, to test the propriety of his classification and the validity of the Board's order to report for induction by the writ of habeas corpus. He therefore reported to his Board on May 12 and was sent with a group of selectees under a leader to Fort Thomas, Kentucky, for induction. He did not accompany the group all the way to Fort Thomas. There was a stop-over for the night at Huntington, West Virginia. Petitioner says that at Huntington the men were informed by a United States Army sergeant, "representing the Army receiving station at Fort Thomas, Kentucky," that from then on they were in the Army; that any unauthorized absence would be treated as an absence without leave; that "Uncle Sam was then paying the bills;" and that the only further step was to proceed to Fort Thomas and don their uniforms. Of course, to be in the Army was the one thing farthest from petitioner's wishes. He called his attorney by telephone and explained the situation. Under the mistaken impression that Huntington was an induction station (as it formerly had been), petitioner's attorney advised him that he had then taken all steps necessary to comply with administrative orders of his draft board short of submitting to induction. Petitioner thereupon left the group of selectees and returned to his home. On June 7, 1944, a warrant was issued for his arrest, charging him with failure to obey the order of his draft board to report for induction on May 12.

The United States attorney, without conceding that petitioner had any litigable rights other than in a criminal proceeding pursuant to the warrant of arrest, was desirous of affording petitioner the opportunity to apply for a writ of habeas corpus, and for that reason petitioner was not taken into custody until his attorney was ready to proceed with the habeas corpus case. Meanwhile, after the issuance of the warrant for petitioner's arrest, several informal conferences were held in the Court's chambers, as a result of which petitioner, concluding upon advice of his attorney that he probably should have gone to Fort Thomas with the contingent of selectees instead of leaving it at Huntington, presented himself again to his local board and requested that he be again sent to Fort Thomas. Upon the Board's refusal to act, he went of his own volition to Fort Thomas and told the military authorities there that he wished to comply with

any and all rules governing selectees except that he would not submit to induction. He was told that under the circumstances nothing would be done. He therefore returned to his home. Later the petition for a writ of habeas corpus was filed. The writ was issued and a hearing was held on August 18, 1944.

It is seen from the foregoing recitation of facts that petitioner, on advice of his counsel and having in mind the decisions of the United States Supreme Court in the cases of Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, and Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, was attempting to avoid placing himself in the category with Falbo, and was trying instead to put himself in the situation of Billings prior to the latter's forcible induction into the Army. Obviously, he did not succeed in doing so, for he left the contingent of selectees before reaching the induction station.

In the Billings case, Mr. Justice Douglas said (321 U.S. at page 558, 64 S.Ct. at page 746): "Moreover, it should be remembered that he who reports at the induction station is following the procedure outlined in the Falbo case for the exhaustion of his administrative remedies. Unless he follows that procedure, he may not challenge the legality of his classification in the courts. But we can hardly say that he must report to the military in order to exhaust his administrative remedies and then say that if he does so report he may be forcibly inducted against his will. That would indeed make a trap of the Falbo case by subjecting those who reported for completion of the Selective Service process to more severe penalties than those who stayed away in defiance of the board's order to report."

■ This language means, in my opinion, that a selectee need not submit to induction in order to exhaust his administrative remedies; but he must complete every step leading up to induction. He must present himself at the induction station and he must be accepted for induction. The very order to report for induction which he is charged with disobeying contains the statement that "persons reporting to the induction station in some instances may be rejected for physical or other reasons." And see Selective Service Regulations, 633.21 and 633.22.

■ Petitioner's attempt to set the administrative process again in motion after the warrant for his arrest was issued cannot avail him now. He is charged with disobeying an order of his draft board directing him "to report for the last step in the selective process." See Falbo case, supra [320 U.S. 549, 64 S.Ct. 349]. His rights must be determined as of the date of the alleged violation. Whatever he may have done or may do after that date can neither excuse nor condemn him. The Rubicon has been crossed. He has set his liberty "upon a cast" and he "must stand the hazard of the die."

I see no substantial difference between petitioner's case and that of Falbo. The Falbo case is conclusive of the proposition that Congress has not "authorized judicial review of the propriety of a board's classification in a criminal prosecution for wilful violation of an order directing a registrant to report for the last step in the selective process;" and since a proceeding by writ of habeas corpus is no less a "litigious interruption of the process of selection" than is similar review in a criminal prosecution, I conclude that the ruling in the Falbo case applies to a proceeding such as this. Albert ex rel. Ravin v. Goguen, 1 Cir., 141 F.2d 302; Billings v. Truesdell, supra, 321 U.S. at page 558, 64 S.Ct. at page 746. Therefore, I will dismiss the writ.