UNITED STATES ex rel. HULL v. STALT-
ER, Director of Civilian Public Service
Camp.

Civil Action No. 472.

District Court, N. D. Indiana,
Hammond Division.

Feb. 9, 1945.

Victor F. Schmidt, of Rossmoyne, Ohio, for Floyd Eugene Hull.

Alexander M. Campbell, U. S. Atty., of Fort Wayne, Ind., and James E. Keating, Asst. U. S. Atty., of South Bend, Ind., for defendant.

SWYGERT, District Judge.

The respondent is the Director of the Civilian Public Service Camp at Medaryville, Indiana. The petitioner is at present in the camp by reason of an Order to Report for Work of National Importance under Civilian Direction issued to the petitioner under the provision of Section 652 of the Regulations issued under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 301 et seq., and which order was issued by Local Draft

Board No. 2 for Perry County, Ohio. Upon a complaint filed by the petitioner in this court for a writ of habeas corpus, a writ issued and a hearing was had.

The facts: The petitioner registered with his local Draft Board on July 1, 1941. His registration card reflects that his employer's name and address was A. E. Hull Pottery Co., Crooksville, Ohio. The petitioner testified substantially as follows regarding this matter: "When I registered I told the Clerk of the Draft Board that my vocation was a minister but that my avocation was a clerk in the pottery. She put down my occupation as a clerk over my protest. At that time I did have a part time job in the pottery where I had worked for a year prior to that time as an office clerk."

Thereafter on August 21, 1941, the petitioner filed his Selective Service Questionnaire wherein he stated that he had been a minister of religion of the sect known as Jehovah's Witnesses since November 1, 1935; that he had been formally ordained on September 19, 1937; and further, that he was preparing for the ministry, which training he expected to complete on September 1, 1941. With his questionnaire he sent to the Draft Board a lengthy letter regarding his claim as a minister of religion and his work as a Jehovah's Witness together with a copy of a letter dated September 1, 1941, addressed to the petitioner from the Watchtower Bible and Tract Society, containing an appointment to him as a "Pioneer" of the Jehovah Witness sect. He also filed with his questionnaire a "Special Form for Conscientious Objector," wherein he claimed exemption provided by the Selective Training and Service Act of 1940 for conscientious objectors.

At the hearing on the writ the petitioner testified that because he was ordered by the Draft Board to report for a physical examination on September 5, 1941, he was unable to depart for Minneapolis, Minnesota, to begin his work as a pioneer until September 8th; that on September 11, 1941, he began his work as such and continued without interruption until his induction. On December 9, 1941, he forwarded to the Draft Board a document which he mentioned in the letter filed with his questionnaire on August 21st. This purports to be a photostatic copy of certificate of ordination as a minister of his sect and is signed by the Watchtower Bible and Tract Society by its president, J. F. Rutherford.

It carries the notation, "active since November 1, 1935."

Also at the hearing on the writ, the petitioner testified that he had been a Jehovah Witness since he had reached the age of understanding and had been quite active as such since he was fifteen years of age; that he had attended the sect's international convention in Toronto, Canada, with his parents in 1929, and a similar convention in Columbus, Ohio, in 1931. That in 1937 at another convention in Columbus he attended "baptismal and ordination services"; that he began performing the "duties of a minister" in McConnelsville, Ohio, in November 1935 (this was substantiated by another witness); that he attended other conventions of his sect in 1939 and 1940; and that on August 9, 1941, during the St. Louis convention he was appointed a full-time minister and given a written assignment to begin his duties in Minneapolis on September 1, 1941. Subsequently he sent his draft board many letters and affidavits signed by fellow religious workers, members of his religious creed, and acquaintances, all attesting to his work as a Jehovah Witness Pioneer in Minneapolis, Wisconsin Rapids, Wisconsin and Lawrenceburg, Indiana. He further testified at the hearing that on April 1, 1942, he became a Special Pioneer and thereafter was assigned to Wisconsin Rapids, and from there to Lawrenceburg. At the hearing, it was developed by petitioner's evidence that in August, 1944, there were eight hundred forty-one Special Pioneers in the Jehovah Witness sect and that this is the highest classification of ministerial work in this religious organization; further, that whereas a Pioneer is required to devote a minimum of one hundred fifty hours per month to church work and organizing "companies," a Special Pioneer must devote a minimum of one hundred seventy-five hours per month to the same kind of duties.

On September 18, 1941, the petitioner's Local Draft Board classified him in class I–AO, that is, as a conscientious objector willing to participate in non-combatant service under the direction of military authorities. On an appeal by the registrant, the Board of Appeal on December 10, 1941, affirmed the Local Board's classification. Thereafter in May 1942, the registrant's file was returned to the Board of Appeal apparently for other administrative purposes than that of review, and on June 3, 1942, the Board of Appeal re-

734

classified him as IV-D, that is, it gave him a minister of religion status. At the request of the State Headquarters of the Selective Service System of Ohio the Board of Appeal voided or nullified this classification after the State Headquarters had pointed out that no appeal was pending at that time. Thereafter at the suggestion of the Department of Justice, an investigation by a Hearing Officer pursuant to Section 5(g) of the Selective Training and Service Act of 1940 was conducted relative to the petitioner's claim as a conscientious objector. The Hearing Officer recommended that he be placed in Class IV-E, that is, a conscientious objector available for assignment to work of national importance under civilian direction. Subsequently the Board of Appeal reclassified him as such on February 3, 1944, and on February 8, 1944, the Local Draft Board issued its final order to the registrant to report for Work of National Importance at the Medaryville, Indiana, Camp.

 The issue before the Court is a narrow one. It is whether the petitioner was denied the constitutional protection of due process of law. If the Draft Board acted arbitrarily or capriciously in classifying him this guarantee was not afforded him. On the other hand, the Court cannot "review" the action of the Board in the ordinary sense of that word and substitute its judgment for the Board's. The finality of decision is with the draft officials, not the courts. As was stated in Ex parte Stanziale, 3 Cir., 138 F.2d 312, 315: "It is * * * clear that a court's criterion must be something different from the 'substantial evidence' rule so familiar in administrative review." What then should be the test of whether the due process requirement was observed? If the "substantial evidence" rule is too broad, I am equally of the opinion that the formula laid down in the Stanziale case is too narrow. In that case the test was stated as follows: "The test of whether a Draft Board's action may be attacked seems to shift from whether its findings are supported by substantial evidence to whether it received and considered what a particular registrant submitted. And lack of such consideration is not here, as it is not elsewhere, proved by proving that the decision was wrong." Rather than this test, I believe that it should be whether the board had any evidence before it to sustain its result.

United States ex rel. v. Cain, 2 Cir., 144 F.2d 944.

The existence or non-existence of arbitrary or capricious action by a draft board in its classification of a particular registrant is essentially the existence or non-existence of a state of mind. It goes without saying that a registrant could seldom, if ever, bring direct evidence (in the sense of assertions by the board members amounting to admissions) of the existence of an attitude on their part that would preclude a fair and impartial determination of his draft status. Consequently and perforce other evidence, circumstantial in nature, must be examined in order for the court to determine the question, narrow but all important as it is.

 One of the circumstances, and in many cases perhaps the only circumstance, that would prove arbitrary or capricious action is the fact that there was no evidence before the board upon which it could base the classification which it has made. If it flies in the teeth of the facts which are before it, then its action is arbitrary and the registrant has not been afforded due process of law.

If then this is the test, certain difficulties arise in its application. These difficulties are twofold. One, factual; the other, judicial.

As to the first, the following statements in the Stanziale case are pertinent:

"The task of classification of the nation's manpower for service in its defense differs greatly from the ordinary administrative action affecting an individual or a group. It is country-wide in scope, it includes a large portion of the population and obviously its operation must be both smooth and swift if the public object is to be accomplished. The enemy will not wait for the process of litigation to determine who must and who may not fight.

"The procedure under the Selective Service Act necessarily, then, differs from the usual administrative routine. There are no hearings of right where witnesses may be called and examined and cross-examined. There is no representation by counsel either on behalf of the registrant or the Local Board. Nor are findings of fact and conclusions of law made. There is no statutory provision for judicial review. The 'administrative tribunal', if the Local Draft Board may so be called, is not composed of

experts, real or purported, but of citizens of the neighborhood in which their Board functions. In some cases it knows the registrants personally; in all cases it knows its own community. The analogy of the ancient jury of the vicinage suggests itself, composed of men of the neighborhood, who knew what was going on. Questionnaires answered by the registrant and supporting written statements present his status, from his point of view, to the Board. But these are not the sole determinants of his classification. Quotas that must be filled and the number of registrants available for military service within a given community are major factors for the Board's consideration. All the Local Board does after a consideration of these facts is to place the registrant within one of the given classifications. The registrant, and he alone may then appear personally, of right, before the Board to argue the correctness of his classification. Appeals to Selective Service Appeal Boards, and in some cases, ultimately to the President, may be had, but only the written file of the registrant goes up on appeal."

This procedure, peculiar to the Selective Service Act, must be kept in mind when a court assays the evidence submitted in a habeas corpus hearing on the question of whether there was any evidence on which a board could base its decision. There is no transcript of the evidence that is considered by the Board. It is not required to make any record of the facts which it considered in reaching its findings or to state the reasons for its decision. It is conceivable that in many cases it might be quite difficult to ascertain what the evidence or facts were that the Board considered.

■ However, in the instant case this difficulty is not as real as it may seem. The petitioner's evidence at the hearing consisted chiefly of papers, documents and forms filed by the petitioner with his Draft Board, supplemented by his testimony regarding his assertions to and his contacts with the Board. He, as well as other witnesses, testified about his spiritual activity and his work in the Jehovah Witness religion, both before and after his draft registration. The Government's only witness was an Army Officer connected with the Ohio State Selective Service Headquarters, who testified mainly about the chronological steps taken by the Local Draft Board, the Appeal Board and other Governmental officials in connection with the petitioner's draft status. If the Local Board or Appeal Board had any other and different information about the petitioner, written or unwritten, it is not before the Court. The case must be decided on the evidence submitted. Consequently, it is necessary to invoke the presumption that the evidence before the Court was the only evidence considered by the Draft Board or available to it. To invoke a contrary presumption, viz., that there may be other existing facts although not submitted to the Court but which may have been considered by the Board only would lead a court into a quagmire of speculation and conjecture out of which there could be no return to a sound footing on which to base the required test.

The other difficulty has to do with the evaluation by a court of the evidence submitted to a draft board. In order to conclude that due process was not observed, it is not enough for a court to say that all of the evidence submitted to the Draft Board required a different determination than that made. To state the converse, that there was no evidence on which the conclusion reached could be bottomed, requires an appraisal of the evidence in a different and more particularized light. To so find the court must assert in effect that each particular evidentiary fact is not susceptible of differences of opinion as to what it tends to prove. If any part of the evidence before the draft board is possible of contrary interpretations, one of which would tend to sustain the board's conclusion, then it cannot be said that there was no evidence before it on which its decision was based. There is a difference between saying that each fact making up the evidence considered by the draft board leads to only one possible deduction and saying that the substantial evidence before the board when taken altogether requires a different classification than that given by the board. In making the first assertion the conclusion to be drawn is that there was no evidence on which it could base its finding; in making the other the court would be substituting its judgment for that of the board.

■ Applying the test, which I believe is required, to the case at hand and in the light of the foregoing observations, it is my conclusion that there was no evidence before the Draft Board (that is, neither the Local nor the Appeal Board) on which to deny the petitioner's claim that he be given a IV–D Classification. Section 5(d) of the Selective Training and Service Act of

1940 provides that "regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service * * * under this Act." Selective Service Regulation 622.44 provides that a "regular minister of religion" is "a man who customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained as a minister of religion; and who is recognized by such church, sect, or organization as a minister," and that a "duly ordained minister of religion" is "a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies in public worship; and who customarily performs those duties."

■ The law appears to be clear that an appeal board hears and determines each case which comes to it de novo and that the classification of a registrant by an appeal board supersedes that of the local board. United States v. Pitt, 3 Cir., 144 F.2d 169. See Mr. Justice Rutledge's concurring opinion in Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305. In the argument of counsel at the conclusion of the hearing it was conceded by the Government that each registrant is entitled to be classified as of the time the classification is made rather than as of the time he registers, or, for that matter, as of any other time.

With these definitions of a "regular or duly ordained minister of religion" as well as the foregoing constructions of the Selective Training and Service Act in mind, there was no evidence before the Draft Board which precluded the petitioner from the classification of a minister of religion. For purposes of argument it may be conceded that he did not meet the definition of a "duly ordained minister of religion" because, either he was not among those listed as ordained ministers in the Yearbook published by the Watchtower Bible and Tract Society for the period in question, or on account of the peculiarities of the organizational features of the Jehovah Witness sect. However, there can be no doubt about his being a "regular minister of religion" as defined in the regulation when the Local Draft Board classified him I–AO. Nor was his status changed when the Appeal Board affirmed this classification on December 10, 1941, or when it reclassified him IV–E on February 3, 1944. During all of this time he was a "pioneer," devoting full time to his religious activities, teaching the tenets of this sect and being recognized by his religious organization as a minister. There is not one iota of evidence on which the Draft Boards could have based a contrary view.

The only evidentiary element that is at all doubtful on this question of status are the facts that at the time the petitioner registered on July 1, 1941, he was working part time in secular activity and that shortly thereafter he received his appointment and became a "pioneer." This, standing alone, might be inferred as an indication of bad faith on the part of the petitioner in attempting thus to dodge military service. However, all of the other facts concerning this registrant's varied and constant religious activity both before and after his registration completely dissipates any such inference.

There is one other circumstance which supports the conclusion I have reached in this case. I refer to the Appeal Board's giving the petitioner a reclassification of IV–D on June 3, 1942, when on a prior date it had affirmed the local Board's classification of I–AO. Although this reclassification was abortive because no appeal was pending at the time, such contrary action by the same Board on the same evidence is not without its potent significance.

■ Perhaps it is not germane to a determination of this case, but I feel compelled to observe that there may be some who profess to be believers in the Jehovah Witness sect who claim to be "regular or duly ordained ministers of religion" who are not such in fact. There may be, also, instances where the draft boards have ample evidentiary reasons for denying those who claim to be "pioneers" a IV–D classification. But because some may attempt to avoid military service without sufficient evidentiary or legal reasons, those who in good faith believe themselves to be and in fact are "regular ministers of religion" should not be denied the exemption to which they are entitled. Each registrant must be considered by a draft board on his own merits; likewise, such cases as these

must be adjudged by the courts on the peculiar facts presented in each individual case.

The petitioner is discharged from the custody of the respondent and his Selective Training and Service Act file and the proceedings relating thereto are remanded to the Appeal Board for the purpose of classifying the registrant properly, pursuant to the order of the court entered herein today.