**LAWRENCE, Major General, v. YOST et al.**
No. 10892.

Circuit Court of Appeals, Ninth Circuit.
June 27, 1946.

BONE and MATHEWS, Circuit Judges, dissenting.

———◆———

Charles H. Carr, U.S. Atty., and James M. Carter and Arthur Livingston, Asst. U.S. Attys., all of Los Angeles, Cal., for appellant.

A. L. Wirin and J. B. Tietz, both of Los Angeles, Cal., and Hayden Covington, of Brooklyn, N.Y., for appellee.

Before GARRECHT, DENMAN, MATHEWS, STEPHENS, HEALY, BONE, and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

A petition in habeas corpus for and on behalf of Raymond E. Yost was filed in the district court. An order to show cause issued, and a hearing was had on the issues joined. Thereafter an order issuing the writ was made and a judgment entered, commanding the discharge of Yost from the restraint alleged. The respondent below appeals.

Yost registered under the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 301 et seq., and in his questionnaire he claimed exemption as a minister of religion, ordained

by the sect known as Jehovah's Witnesses. He was classified as a conscientious objector, and upon notice thereof he claimed such classification was wrong. The appeal board reclassified him as I-A and he was ordered to the induction center, there to be inducted into the armed forces. After passing his physical test and after obeying each and every administrative step, from registration to presenting himself at the induction center to which the board ordered him, he was accepted by army officials, and the induction ceremonies went forward, with him and about seventy-five other registrants present.

Thereafter the army authorities proceeded to exercise authority and restraint over him. He was given a limited release, subject to keeping his draft board notified of his whereabouts, and later was ordered to report to an army headquarters. After his temporary release and after the order to report had been received, he appears to have continued in his ministerial work. He did not report, as he was ordered to do, and later he was arrested for being absent without leave and taken to an Army camp and held there by army authorities.

Yost, through his petition, contends that he did not submit to induction, that he was not inducted, and is therefore a civilian, and that the military officials are exercising illegal restraint over him.

Prior to the decision by the Supreme Court in the cases of Estep v. United States and Smith v. United States, 66 S.Ct. 423, it was unsettled as to whether or not a registrant under a board's order to report for induction was under the necessity of submitting to induction before he could defend against a prosecution for disobeying a board's order, 50 U.S.C.A.Appendix, § 311.

The point is settled in the majority opinion of the cited cases, wherein it is said that "Submission to induction would be satisfaction of the orders of the local boards, not a further step to obtain relief from them." In those cases each of the defendants was being prosecuted for disobeying a Selective Service Board's order. The decision of the Supreme Court was that both Smith and Estep could defend against the prosecution, notwithstanding neither of them had submitted to that part of the board's order directing them to submit to induction. In the instant case the petitioner claims that he did not comply with the board's order to submit to induction and for that reason he has never become a member of the military forces; hence, the military authorities have no legal authority over him or over his actions.

Of course, it is perfectly clear that since actual induction is not a sine qua non to the registrant's right to interpose his defense in a prosecution for an alleged offense, induction is not necessary in Yost's case, wherein it is alleged in the petition that by the very reason of the fact that he has never been inducted into the army, the army has no jurisdiction over him.

Had the trial court found that Yost had in fact been inducted, other questions considered by the trial court in the then unsettled condition of the law, would be present. As it is, the question is simplified to this: Does the evidence support the trial court's conclusion that Yost was not inducted? If that conclusion can be sustained, the army has never had any jurisdiction over him, and the judgment must be affirmed. We turn to the consideration of that question.

The board's file as to registrant Yost was introduced into evidence, and it shows that he claimed exemption as a minister of religion in his questionnaire. A few days later he claimed exemption as a conscientious objector. [This claim was made on a special form (Form 47), and from a number of cases which we have reviewed, it seems to be a general practice for the boards to require all registrants who claim to be ministers to fill out this form.] There is some inconsistency between the claims in the questionnaire and the statements in Form 47. In the latter there is a request to be classified as a conscientious objector, which entails civilian camp duty on work of national importance, and in the questionnaire the request is for classification IV-D, or as a minister of religion, and therefore exempt from any service. The form is printed and the registrant is required to check the statement he selects. It is

claimed in both the original questionnaire and the Form 47 that the registrant is exempt from military duty. All of the facts just related were proved at the habeas corpus hearing.

At the hearing the petitioner testified that he told four or more officers and non-commissioned army men about the induction center that he did not intend to take the oath which was a part of the induction ceremonies, and that immediately after the ceremonies he asserted to the desk man who was handling orders that he had not taken the oath. Thereafter petitioner consistently contended that he had not taken the oath and had not been inducted.

It is not contended here that the affirmative taking of the oath is required by the statute or by the regulations under it. What is claimed is that before a registrant becomes a member of the military forces he must have submitted to such induction ceremonies as were currently held. The ceremonies practiced in the class of around seventy-five selected registrants to which Yost belonged appear to have been quite simple. The registrants were seated in a room, and an army officer gave a short talk upon the subject of soldiers being A.W.O.

L., about the conduct of a soldier, and as to a citizen's duty. The members of the class of registrants were then requested to stand, raise their right hands and repeat, line by line, an oath which was read to them.[1] The registrant's affirmative voluntary conformance necessary under Billings v. Truesdell, 321 U.S. 542 at 558, 64 S.Ct. 737, 88 L.Ed. 917,[2] to this part of the ceremony was the only part of it in which some act of acceptance of the induction by the registrant was required. It most certainly was the high light of the proceeding. Yost testified, and the trial court believed him, that he stood when the class was requested to stand, that he did not conform to the request given the class that each member should raise his hand, and did not conform to a like request to repeat the oath, line after line, as it was read, and that he did not take the oath.

Sometime after the induction ceremonies had been conducted, Yost made a written report to an agent of the Federal Bureau of Investigation, which is entirely consistent with his claim as to the happenings at the induction center. We set it out in full in the margin.[3]

Yost also informed his draft board in

---

[1] Subsequently the method of induction was changed so as to practically eliminate the possibility of doubt as to the actual induction of any member of an induction class.

[2] Billings v. Truesdell, 321 U.S. 542, 558, 64 S.Ct. 737, 746, 88 L.Ed. 917: "Moreover, it should be remembered that he who reports at the induction station is following the procedure outlined in the Falbo case [320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305] for the exhaustion of his administrative remedies. Unless he follows that procedure he may not challenge the legality of his classification in the courts. But we can hardly say that he must report to the military in order to exhaust his administrative remedies and then say that if he does so report he may be forcibly inducted against his will. That would indeed make a trap of the Falbo case by subjecting those who reported for completion of the Selective Service process to more severe penalties than those who stayed away in defiance of the board's order to report."

[3] "On December 7, 1943, I reported to my Draft Board at Marshfield, Oregon. It was in the evening. The whole group including myself then were taken by train

to Portland, Oregon, arriving there on the morning of December 8, 1943. In Portland, we were taken to the induction station where I was given a physical examination in the morning. After this examination I signed a paper which I believe stated that I have passed the physical examination. After the physical examination, I told some officers, whose names I do not know but who was asking if I wanted to enter the Army, Navy or Marine Corps, that I did not want anything to do with any of them. He said it didn't matter that I was going anyway.

"After lunch, the whole group numbering about 75, including selectees from other draft boards and myself, reported to a room where a short talk was given to us by an army officer who explained about being AWOL and the proper conduct of a soldier. During the talk he told us that we would report at Fort Lewis, Washington, but that it would be in about 3 weeks and that we should contact our own draft boards for the exact time. After this talk the officer told everyone to raise his right hand and repeat the oath after him line by line. I was in the last row. I did not raise my

terms consistent with his claim, which we quote in the margin.[4]

Lieutenant Leigh, who conducted the ceremonies, in a statement admitted into evidence by stipulation, says: " * * * that he observed no unusual incident at the time and at that time when prospective inductees refused to take the oath, they were inducted nevertheless if found to be otherwise qualified." This practice, we understand, was abandoned after decision in Billings v. Truesdell, supra.

While some of the evidence here related may be self-serving in nature, it was received without objection and without limitation of purpose and the court gave it credence. There is no error claimed by appellant on that score.

Of course, it is logical argument to present to a fact finding court that Yost held it in his power to speak out at the time the oath was being read or otherwise to indicate his refusal to conform to the ceremony in such a manner as to make a mistake in the matter quite impossible. His burden, however, was not so great as to require him to do all in his power in that regard. He had already been outspoken that he would not take the oath and in accordance therewith he testifies that he did not take it. The slightest attention on the part of the induction officials would have revealed whether anyone of the class was disregarding the request to hold up his hand or to repeat the oath. No official intimates that he made any effort to observe the conduct of the registrants. Lieutenant Leigh's negative statement on this point is highly indicative that the induction officials did not consider that the registrants had any volition in the matter. The army was giving commands before the registrant was in the service.

▇ In the circumstances there appears to have been that degree of substantial evidence before the trial court which is required to support its conclusion that Yost did not in fact submit to induction. The restraint complained of is therefore without warrant in law and the judgment must be affirmed.

Affirmed.

DENMAN, Circuit Judge (concurring).

I concur in the majority opinion and its reasoning, the more so because I am impressed with Yost's candor and integrity in a situation where it takes a man of intellectual courage not to reshape his memory to suit the occasion. This was

---

right hand and I did not repeat the oath or any part of it.

"After the oath was given, we went to another room where our names were called out and we were each given a piece of paper telling us to report at Ft. Lewis, Washington. We all, including myself, initialed a paper on the table. I do not know what was on this paper. I then told the man who was either an officer or an enlisted man in the Army that I was not going to report and was not going into the Army. He told me to shut up and get out of the way, that I was going anyway and that I had passed the physical examination and was in the Army. During the time I was at the induction station, I told one officer and a corporal or a sergeant and one or two others that I was not going to go into the Army and had not taken the oath.

"After this, I then returned to Marshfield, Oregon, on the train leaving Portland on the night of Dec. 8, 1943, and arriving at Marshfield on the morning of Dec. 9. On my return home, I continued my evangelistic work of Jehovah Witness. On December 28, 1943, I called my Local Draft Board to determine when I was supposed to report at Ft. Lewis. The Clerk told me on Dec. 29, 1943, I was to report. I told the Clerk that I was not going to report and that I had not taken the oath at the induction center. She told me that the draft board reflected that I was already in the army. She asked me where I could be reached and I told her through post office box 1263, Myrtle Point, Oregon.

4 "12-28-43

"Mr. Yost called from Coquille and stated that he does not intend to report to Fort Lewis. Says it would mean 'Eternal Death' if he should go to war. Will be available at his address in Myrtle Point. Claimed he has a covenant with his God and that the Consc. Ob. would not be the place for him either. He was told that he would be listed as a deserter and he said he 'probably would'. *Claimed he did not take the oath.*"
(Report of a conversation with the petitioner given by the Secretary of the Board and in files of the Board under date of December 28, 1943.)

recognized by Major General Lawrence himself in his frank statement in his brief here that Yost had refused to obey the officer's order to take the oath.

BONE, Circuit Judge (dissenting).

I dissent. The testimony and the record present a situation clearly calling for reversal in this case.

Yost did not raise his hand, or "take" the oath in the induction ceremony. However, taking the oath—repeating the words —or not doing so, would not of itself put him in or keep him out of the army. The Army Regulations applicable at that time and having the force and effect of law, say so. Their provisions constitute a solid benchmark that should guide us on that particular point.

To support the judgment of the lower court is to disregard this binding law.

While wholly immaterial, concede for argument's sake that Yost did "reject" the oath. Even so, one cannot fail to be impressed by his manner in rejecting it. The record is crystal clear that he manifested this oath "rejection" so quietly and unobtrusively (from the place where he was standing in the back row) that he failed to challenge the attention of anyone there. Unless we wholly disregard the record, we must conclude that he was the only one who actually knew he was rejecting it.

Of course the oath was "part" of the induction "ceremony", but even a casual inspection of the Regulations will indicate that the fact that a man did or did not repeat it is not impressive because the law robs it of a decisive character. This, because the controlling regulation says, in effect, that the oath may be disregarded or rejected by the inductee without affecting his status.

Certainly it cannot be urged that the "ceremony" in the room where the oath was being administered, was not the *final step*—the room, the *final spot* where the ultimate and effective decision *had* to be made which alone could determine the status of Yost. The logic of the cases is to the contrary. Justice Douglas makes this abundantly clear when in Billings v. Truesdell, 321 U.S. 542, at page 559, 64 S.Ct. 746, 88 L.Ed. 917 he says: "These considerations together indicate to us that a selectee *becomes 'actually inducted'* within the meaning of § 11 of the Act when in obedience to the order of his board *and after the Army has found him acceptable for service he undergoes whatever ceremony or requirements of admission the War Department has prescribed."* [Emphasis supplied.] At that point, and by the "ceremony", is he "actually inducted" into the Army. Argument to the contrary merely invokes futile discussion. Since the taking of the oath was not decisive on the final and important question of civilian or military status,[1] it necessarily follows that some other *affirmative* step had to be taken

[1] At the time of the Yost induction the Army Regulations then in force and effect contained the provisions reading as follows:

"Army Regulations

"No. 615-500

"Section II

"13. Procedure * * *

"(d) Induction. Upon completion of the physical examination and after certification by a medical officer, selectees found to be physically and mentally fit for general military service will be inducted.

"(e) Induction ceremony. ·

"(1) The induction will be performed by an officer who, prior to administering the oath, will give the men about to be inducted a short patriotic talk. The ceremony should take place in a setting, preferably a large room, made colorful by the display of flags with guard and display of suitable pictures, and made as impressive as possible. Wherever practicable, martial music will be provided either by a band or in the form of recorded music. For the benefit of any nondeclarant aliens about to be inducted the induction officer will explain the difference between the oath of allegiance and the oath of service and obedience. The oath, Article of War 109, will then be administered:

*        *        *        *        *

"(4) They will then be informed that they are now members of the Army of the United States and given an explanation of their obligation and privileges. In the event of *refusal* to take the oath (or affirmation) of allegiance by a declarant alien *or citizen* he will not be required to receive it, but will be informed that this action does not alter in any respect his obligation to the United States.

by Yost to somehow and in some way indicate then and there that he *refused* to be inducted. See Mayborn v. Heflebower, 5 Cir., 145 F.2d 864; Hibbs v. Catovolo, 5 Cir., 145 F.2d 866.[2]

Unless the Selective Service Act is void of meaning, it is obvious that at some point in this, the final step in the induction process, Yost was required to "speak up" and "refuse to be inducted"—or he was inducted. As a matter of law, the very nature of the process placed a legitimate and logical burden on him to there make known a decisive choice as to whether he would remain a civilian, and be amenable to the penalties of the Selective Service Act, or enter the army. He was the one who (under the law) had to assert his choice and to *act,* and act affirmatively. Where in the law or Regulations is there authority for us to impose upon the inducting officer the *duty* of asking each of the assembled men if he was then and there "refusing" to be inducted? The very question invites the only rational answer. But the majority substitutes the undenied silence and utter passivity of Yost, standing in the back row, for some sort of an "act" which (when added to certain statements made outside the induction ceremony room) it identifies and sanctions as a legal "refusal" to be inducted. The applicable Regulations deny the validity of such an induction ceremony "refusal". (See footnote 1).

Let it be recalled that if a man claims exemption from service under the Act (as a minister, for example) he is required to act affirmatively by specially making known to draft boards the factual basis of his claim for exemption. The procedure to be employed in the making of such a claim is carefully prescribed and passivity and silence are not a substitute for such procedure. A man is required to *act*—and act at the proper time and in the prescribed manner if he would secure the classification he desires which would permit him to escape combat service.

Both Yost and his counsel freely concede that one single affirmative act in the form of a brief and gentlemanly statement by Yost to the officer in charge of the ceremony that he "refused to be inducted", would have fully preserved his civilian status. The Yost induction proceeding at the ceremony would have abruptly ended right there had he made known to the inducting officer the "intention" he claims he so freely expressed in a number of places outside the induction room. As a matter of fact and law, such a refusal in the induction room would have kept him out of the army *if he had never uttered a protest to anyone outside that room.* Before the lower court Yost expressed regret that he did not "speak up" and tell the officer in charge of the ceremony that he was then and there refusing to be inducted. Yost thus made plain that he understood that the induction room was the one and only place where his "intentions" could (lawfully) be translated into exemption from military service by the simple act of refusing to be inducted. Having failed to do this, he now seeks to buttress his right to exemp-

---

In the event a nondeclarant alien refuses to take the oath of allegiance or the oath of service and obedience the following statement will be typed under 'remarks—administrative' of the service record [Emphasis supplied.]:

"Read the oath of service and obedience for aliens, upon refusal to swear thereto, and was informed that his refusal to so swear to the oath did not in any way alter his obligation as to service and obedience to the United States."

[2] It clearly appears in the Estep and Smith cases, 66 S.Ct. 423, that both men were ordered to report, and did report, to the induction station where both were accepted for service. Both men *then* refused to be inducted, (i.e. submit to induction). This was the posture of the cases in the Supreme Court. It would require a fantastic stretch of the imagination to assume that the Supreme Court was not passing on the final and positive *act* of refusing (after acceptance) to be inducted by the lawfully designated officer charged with the duty of "inducting" men *in the final inducting "ceremony".* Nor can we logically assume that Estep and Smith stood mute and motionless when the time came for them to be "inducted". The Supreme Court opinion plainly indicates to the contrary. That a positive refusal to be inducted is necessary when induction is attempted, seems clearly to be inferred from the quoted language of Justice Douglas, supra, in the Billings case.

tion by introducing into the record, a series of what amounts to self-serving declarations, made at various times outside the ceremony room, regarding his "intention" to refuse to be inducted.

From his testimony it is apparent that Yost was trying to convince the trial court that he, Yost, was so courteous that he could not force himself to wound the feelings of the young officer in charge of the "ceremony" by any sort of an interruption such as asking for permission to make a brief statement. Such an attitude reveals admirable restraint. . But he exercised this restraint at the one and only possible time and place where simple candor and a frank repetition of the protests he had previously made outside the ceremony room, admittedly would have kept him out of the army. We admire courtesy, but even in its most delightful forms, it is not a substitute for law.

The testimony of Yost concerning his silence at the induction room ceremony, is in strange contrast with his frequently voiced objection to entering military service, made to several people before and after the ceremony. If we are to believe his testimony, he took advantage of every possible opportunity (outside the ceremony room) to assert to everyone whom he regarded as being in any way connected with the process of making soldiers, that he was refusing to submit to induction. But the cold, hard fact remains that in so doing, he was then voicing an "intent", which (measured by the law), was as futile as the vagrant winds of the heavens unless he translated that intent into some understandable form of affirmative action (i. e. refusal to be inducted) at the one and only time and place where such action would or could be effective under the law. So the law and the regulations call upon us to confront the question of *where and how* this "refusal to be inducted" *had to be asserted if it was to be legally effective.*

The effective answer lies in the quotations herein from the opinion of Justice Douglas in the Billings case.

I believe the majority is wrong for another reason. Let us assume that prior to and wholly apart from the induction ceremony, Yost had stated to all of those with whom he discussed the within matter, that his greatest desire was to enter the army and that he was irked by official red tape which delayed his induction. When introduced to the (final step) induction room he suffered a complete change of heart and for some reason decided that he would refuse to become a soldier. When the final induction ceremony got under way he interrupted the ceremony long enough to tell the inducting officer that he then and there *absolutely refused to be inducted.* (He could not be forcibly inducted. Billings v. Truesdell, supra.) Under such circumstances would the majority say that all of his prior outside statements (introduced into the record, as here) changed in the slightest degree the *legal effect* of such a point-blank *refusal to be inducted?* Faced by such a reversal of the facts in this case, the majority would find no difficulty in wholly ignoring his prior outside declarations, regardless of their vigor or import. In the light of the blunt refusal to be inducted (in the ceremony room), these previous expressions of "intention" would become utterly *void of legal significance.* The conclusion that Yost had violated the Selective Service Act, by this refusal to be inducted, would be inescapable.

The testimony of Yost clearly reveals that he was not awed in the slightest degree by the presence of military men or Selective Service officials, singly or in groups, on the numerous occasions outside the ceremonial room at which time he aggressively voiced his protests against induction. The majority overlooks this more than interesting aspect of the case. Why ignore the obvious and inescapable legal truth that not one of these (outside) persons could exercise a vestige of control over the final and decisive step of actual induction. Whatever may have been the area of their authority over some one or more of the steps *leading toward the final act of induction,*[3] not one of them had

---

3 "These regulations thus suggest that induction follows acceptance and is a *separate process.* \* \* \* This makes unambiguous \* \* \* that selectees were inducted *by the ceremony* and not before it." [Emphasis supplied.] Billings v. Truesdell, supra, 321 U.S. page 554, 64 S.Ct. 744, 88 L.Ed. 917.

*legal power* to actually "induct" Yost. Not one of these persons could have put him into or kept him out of the army. Yet the majority of the court attributes to the self-serving statements Yost made to these people, a legal significance that the law wholly rejects. It sees so much significance in these statements that it decides to add them to the utter silence of Yost in the induction room, and then spell out a legal refusal to be inducted. It endorses the odd view that the "silent treatment" process adopted by Yost at the final ceremony completed a cycle of "refusal". With the aid of the outside self-serving statements (as colorful background) the majority virtually holds that Yost successfully "thought" himself out of the army at the final induction ceremony—a novel and startling legal exploit, to say the least. Small wonder that the trial court was moved to comment on the "prescience" of Yost which (the court says) enabled Yost to clearly understand obscure aspects of the Selective Service Act which were then puzzling learned judges all over the country. Securing exemption from military service in the manner here indicated exemplifies a situation clearly not contemplated or sanctioned by Congress.

The conclusions announced in the majority opinion would appear to rest upon the assumption that these legally ineffective outside declarations relieved Yost of the duty, at the proper time and place, to openly and positively *refuse to be inducted*. The decision, in effect, holds that Yost owed absolutely no legal duty of any kind to advise the officer who was inducting him, and who had the authority to do it, *that he was then and there refusing to be inducted*. There is not a line of testimony to prove that the young officer in charge of the induction ceremony had the faintest idea that Yost was *refusing to be inducted*. Yost did absolutely nothing to call attention to any act of his which would indicate that he was refusing to be inducted. The officer stated (stipulated testimony) that he recalled no unusual circumstances surrounding the induction of Yost and that he was certain he would have recalled them, had any existed. As pointed out above, neither the Selective Service Act nor the Regulations place, nor do I believe they can properly be construed to place, on the inducting officer the legal duty of interrogating each and every man in the ceremony room to ascertain whether any of them is refusing to be inducted. I can see no justification in stretching the laws and the regulations in force at that time to cover the facts of this case.

The prevailing opinion seems out of harmony with the cited holding in the Billings case, supra. Yost was duly and legally inducted and the judgment of the lower court should be reversed.

MATHEWS, Circuit Judge, joins in this dissent.