GIBSON v. REYNOLDS et al.

Civil Action No. 459.

District Court, W. D. Arkansas,
El Dorado Division.

May 12, 1948.

Hayden Covington, of Brooklyn, N. Y., and William E. Wiggins, of Texarkana, Tex., for plaintiff.

R. S. Wilson, U. S. Atty., and David R. Boatright and Charles A. Beasley, Jr., Asst. U. S. Attys., all of Fort Smith, Ark., for defendants.

JOHN E. MILLER, District Judge.

The defendants, A. P. Reynolds, E. H. Mellor, and B. R. McClanahan, were members of Selective Service Local Board No. "A" of Union County, Arkansas, with headquarters at El Dorado in said County and State.

The defendant, S. C. Vinsonhaler, was chairman of Selective Service Appeal Board No. 2 located at Little Rock, Arkansas, and the defendant, Joe K. Mahony, of El Dorado, Arkansas, was a member of said Appeal Board.

The defendant, E. L. Compere, was State Director of Selective Service, and the defendant, Troy W. Lewis, was chief of the Legal Division and Assistant to the Selective Service State Director at Little Rock, Arkansas.

The defendants have filed identical motions to dismiss the complaint on the allegations (1) that the complaint fails to state a claim against them, and (2) if such a claim is stated, the complaint shows on its face that such claim is barred by the statute of limitations.

The allegations of the complaint and the inferences fairly deducible therefrom in summary are as follows:

The plaintiff is a citizen and resident of the State of Indiana. The defendants are all citizens and residents of the State of Arkansas. The jurisdiction of the court is invoked under Subsection (1) of Section 24 of the Judicial Code, 28 U.S.C.A. § 41 (1), and upon the allegation that the amount involved exceeds $3,000 exclusive of interest and costs. Also, jurisdiction is invoked irrespective of the amount of money involved upon the claim that the action arises under the laws of the United States and involves purely and solely civil rights under and by virtue of the Civil Rights Act of 1870, 8 U.S.C.A. § 41, and Subsections (12) and (14) of Section 24 of the

Judicial Code, 28 U.S.C.A. Section 41(12) and (14).

At all times material the defendants were duly qualified and acting in the capacities hereinbefore stated, but are sued individually.

The plaintiff registered under the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 301 et seq., and on October 12, 1942, filed the usual Selective Service questionnaire in which he answered the questions therein propounded, and asserted his status to be "minister of religion." Specifically he stated:

"I have completed 8 years of elementary school and 1 year of high school. I have had the following schooling other than elementary and high school: Divinity school; course of study, Ministry; have attended a full two years and still attend. The job I am now working at is minister of religion. I do the following kind of work in my present job: Preaching the Kingdom of God for which Jesus taught his followers to pray (Matthew 6:10). I have also worked at the following occupations other than my present job, during the past 5 years: Farm laborer, farming from 1934 to 1940. My usual occupation, or the occupation for which I am best fitted, is ministry work. I would not consider accepting a job which would require me to move away from my present home. I am a minister of religion. I do customarily serve as a witness. I have been a minister of Jehovah's witnesses since June 1938. I have been formally ordained. My ordination was performed on September 9, 1938, by Brother Miller at Birmingham, Alabama. I am a student preparing for the ministry in a theological or divinity school. I am attending the Watchtower Bible and Tract Society, which was established before September 16, 1939, and is located at 117 Adams Street, Brooklyn, New York."

The plaintiff claimed classification of IV–D under Section 5(d) of the Selective Training and Service Act and Section 622.-44 of the Selective Service Regulations.

On November 6, 1942, the defendants, members of the Local Board classified him in class 1–A, and the plaintiff appealed to the Board of Appeal, and on May 8, 1943, the defendants, Vinsonhaler and Mahony, as members of the Board of Appeal, reversed the classification of the Local Board and classified the plaintiff in class IV–E, which was a denial of his claim for exemption from training as a minister of religion and made plaintiff liable for service in a civilian public service camp as a conscientious objector.

Plaintiff by letter requested the defendant, E. L. Compere, to appeal the determination to the President of the United States, and to stay the induction process, but the defendants, Compere and Lewis, refused to take the requested action, and on May 23, 1944, plaintiff was assigned to do work in a civilian public service camp.

On September 1, 1943, the plaintiff was notified to appear on September 22, 1943, for a preinduction physical examination, and at that time he was found "physically fit" and accepted for civilian service. On August 8, 1944, plaintiff was mailed an order to report for work of national importance and for him to appear at the Local Board in Carlinville, Illinois, on August 21, 1944. He appeared at the Local Board in Carlinville, Illinois, on August 21, 1944, and was sent to the public service camp at Hill City, South Dakota, where he remained until August 28, 1944, when he was given another physical examination, and was found physically acceptable. The plaintiff did not report to do work of national importance, but appeared at the camp merely to complete the administrative process incident to induction.

The plaintiff requested the Director of the camp to give him a statement showing that he had reported to the camp on August 23, 1944, and that administrative process of induction was completed without the performance of any work by the plaintiff, and upon receipt of such statement the plaintiff left the camp.

On December 2, 1944, plaintiff was arrested upon a charge of violating the Selective Training and Service Act of 1940, as amended, contained in an indictment returned in the District Court of the United States for the District of South Dakota. After a motion to quash the indictment had been overruled, the plaintiff

pleaded "not guilty," and on February 13, 1945, he was tried and convicted and sentenced to 5 years in the custody of the Attorney General of the United States. He appealed to the United States Circuit Court of Appeals for the Eighth Circuit and the judgment of conviction was affirmed on June 15, 1945. Gibson v. United States, 8 Cir., 149 F.2d 751. The Supreme Court of the United States granted certiorari and on December 23, 1946, the judgment of conviction was reversed and the case remanded to the United States District Court for the District of South Dakota for a new trial. Gibson v. United States, 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331. On February 4, 1947, the indictment was dismissed by the District Court and the plaintiff was discharged.

At the time the plaintiff registered under the Act and at all times material herein the file of plaintiff in the offices of the Local Board showed that plaintiff was claiming to be a duly ordained minister of religion, and he submitted proof in the form of statements and affidavits of Jeovah's witnesses stating that they recognized him as performing the duties and funnctions of an ordained minister; that at the time the plaintiff was classified in IV–E by defendants, Vinsonhaler and Mahony, and his requested appeal was refused by defendants, Compere and Lewis, he was devoting his full time to preaching as a "pioneer" missionary evangelistic minister of Jehovah's witnesses; that the defendants refused and failed to consider the proof submitted by plaintiff in support of his contentions, and that they acted contrary to and in violation of Section 622.44 of the Selective Service Regulations and opinion No. 14 of the Selective Service National Headquarters concerning Jeovah's witnesses; that the defendants thereby discriminated against plaintiff contrary to the due process clause of the 5th Amendment of the Constitution of the United States and deprived him of the procedural rights of due process to a full and fair hearing by a fair and unprejudiced board contrary to the due process clause of said constitution.

That there was no evidence, oral, documentary, or written, before defendants which disputed his claim; that the defendants did not show the plaintiff was an imposter or that he fictitiously or falsely claimed to be a minister, and there was no evidence in any form before the defendants which showed that the plaintiff was not a minister of religion.

"By reason of the foregoing, the said defendants did not have authority or jurisdiction under the statute to order him to report for service under the Act, because upon the facts and evidence before defendants, plaintiff was exempt from all training and service. The said defendants had no discretion or authority under the law to reject plaintiff's claim that he was a minister of religion and, as such, statutorily exempt, which said claim in effect constituted a special plea to the jurisdiction of the Selective Service System and of the defendants. The acts of the defendants, therefore, were ultra vires."

The acts and conduct of the defendants in rejecting plaintiff's claim of exemption as a minister constituted prima facie unlawful discrimination against him, and such acts of the defendants constituted and were a denial of his liberty and fundamental rights without due process of law.

"That the acts and conduct of defendants, who acted jointly and severally, in denying plaintiff's claim for statutory exemption as a minister of religion, and classifying him as liable for training and service under the Act in the teeth of the undisputed proof that he was regularly serving as a minister of religion, were in bad faith, malicious and without just cause or excuse as well as arbitrary, capricious and in defiance of the Selective Training and Service Act of 1940, as amended, and the Regulations promulgated thereunder; that such acts and conduct of the defendants, acting jointly and severally, resulted in the aforesaid arrest and·malicious prosecution of the plaintiff without probable cause, and that such prosecution was the direct and proximate result of the aforesaid unlawful malicious acts of the defendants and was without reasonable or probable cause and resulted in the injury and damage suffered and sustained by the plaintiff."

As a direct and proximate result of the alleged unlawful acts and conduct of the defendants, the plaintiff was arrested, indicted, maliciously prosecuted without probable cause, convicted, sentenced to prison and "during the pendency of his appeal to the Supreme Court of the United States" illegally forced to spend approximately one year in the Federal Correctional Institution at Sandstone, Minnesota, all to his damage to the extent of $10,000.

The attorneys for the respective parties have filed elaborate briefs and have ably presented their contentions.

The principal claim of the plaintiff is one for damages alleged to have been suffered by him as a result of the alleged malicious prosecution in the District Court in South Dakota.

Defendants in their brief contend that the complaint should be dismissed because it fails to state a claim for malicious prosecution in that (1) it appears from the face of the complaint that the defendants had nothing to do with the "causation" or instigation of the prosecution (it being within the sole discretion of the United States Attorney whether or not to prosecute), (2) that he has failed to allege, except by conclusion of law, that there was lack of probable cause for his prosecution, and, in fact, it appears from the complaint that the prosecution resulted from the plaintiff's deliberate act of leaving the public service camp, which act was all the probable cause needed for his indictment and trial, and (3) that he has failed to allege any malice on the part of the defendants in regard to the prosecution in South Dakota. In addition to the above the defendants assert that they are not subject to liability herein, for the reason that the acts alleged in the complaint and upon which the plaintiff bases his claim were performed by them while they were federal officers acting within the scope of their authority.

The defendants' position in regard to their defense of the statute of limitations is as follows: If the plaintiff is attempting to assert any claim other than that of malicious prosecution, then it is barred by the Arkansas statute of limitations governing tort liability (Pope's Digest of the Statutes of Arkansas, Section 8928; three years), because the last thing that occurred as a direct result of the actions of these defendants took place when the plaintiff entered the Civilian Public Service Camp, which was more than three years prior to the commencement of this suit. However, the defendants admit that the defense of the statute of limitations is not applicable to the claim of malicious prosecution, since the statute did not begin to run until the indictment in South Dakota was dismissed on February 4, 1947.

Aside from the statute of limitations issue the position of plaintiff is summarized in his brief as follows:

(1) "The defendants, administrative officers, are personally liable for damages resulting from their acts, which are alleged to have been committed in excess of authority while discharging their official duties, irrespective of malice.

(2) "The acts of the defendants, as alleged in the complaint, were contrary to the Act and the Regulations, without basis in fact, arbitrary and capricious, and therefore clearly in excess of authority of defendants conferred by law.

(3) "The defendants, administrative officers, are personally liable for damages resulting from their acts alleged to have been committed in excess of authority while discharging their duties, maliciously, arbitrarily, capriciously, contrary to law, and without basis in fact.

(4) "A sufficient showing of defendants' connection with and cause of plaintiff's malicious prosecution appears from the allegations made in the complaint so as to make them liable."

 Judge Sanborn of the Eighth Circuit Court of Appeals in the case of Dennis et al. v. Village of Tonka Bay et al., 151 F.2d 411, 412, has accurately set out the principles governing the approach of a trial court to a motion to dismiss for failure to state a claim upon which relief can be granted:

"Under the present practice in the District Courts of the United States, a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, admits the existence and validity

of the claim as stated, but challenges the plaintiff's right to relief. Leimer v. State Mut. Life Assur. Co., 8th Cir., 108 F.2d 302, 305. This Court has said that there is no justification for dismissing a complaint for insufficiency of statement unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim. Leimer v. State Mutual Life Assurance Co., supra, at page 306 of 108 F.2d. See, also, Sparks v. England, 8 Cir., 113 F.2d 579, 581, 582; Cohen v. United States, 8 Cir., 129 F.2d 733, 736; Louisiana Farmers' Protective Union v. Great Atlantic & Pacific Tea Co., 8 Cir., 131 F.2d 419, 423, 424; Musteen v. Johnson, 8 Cir., 133 F.2d 106, 108; Publicity Building Realty Corporation v. Hannegan, 8 Cir., 139 F.2d 583, 586; Cool v. International Shoe Co., 8 Cir., 142 F.2d 318, 320."

In the instant case, treating all proper and material allegations as true for purposes of this motion, it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which could be proved in support of his alleged claim.

Although there appears to be considerable force in the argument of the defendants that the cause should be dismissed for reason of failure to state a claim for malicious prosecution upon which relief can be granted, the court does not feel that it is necessary to decide this point or the issue raised by the asserted defense of the statute of limitations, in view of the opinion of the court on the claim of defendants to immunity from civil liability.

The defendants, members of the Local Draft Board, Appeal Board, State Director of Selective Service, and Assistant Director, fall within the ambit of the rule of immunity from civil liability accorded federal officers while acting within the scope of their authority. No case concerning officers acting in these particular official capacities has been called to the attention of the court, but clearly these defendants are protected by the rule of immunity. In fact, the plaintiff does not contend otherwise. He does state, however, on page 22 of his brief, that:

"The rule of absolute immunity, which enshrouds the judiciary, has not been extended by holding to protect administrative officers. The defendants urge that it has. While there may be some dictum in the opinions, to the effect that a public federal officer is protected against liability for acts in excess of authority on the theory that immunity extends to protect him for every act done under color of office * * *, yet all the cases held that the immunity applied because the acts complained of were committed within the scope of authority conferred by law upon the officers."

While the rule originated with officials judicial and quasi-judicial, it has been extended to other federal officers generally, and, therefore, even though draft boards, in the discharge of their official duties, perform quasi-judicial acts, the extension of the rule to cover them need not depend upon that classification. The position that the plaintiff takes in the above quotation is not entirely clear. He seems to argue that the rule protecting the judiciary is absolute, but when we reach these "administrative officers," the rule becomes something less than absolute. It seems that a more accurate statement is that the rule of immunity either protects the particular officer, judicial or otherwise, or it does not protect him, and certainly a federal officer, including a judicial one, may so palpably exceed the scope of his authority as to remove himself from the protective coverage of the rule.

In Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 637, 33 L.Ed. 780, (the rule of immunity was extended to protect the Postmaster General, an executive officer), the court said:

"We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions apply, to a large extent, to official comunications made by heads of executive departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. As in the case of a judicial officer,

we recognize a distinction between action taken by the head of a department in reference to matters which are manifestly or palpably beyond his authority,· and action having more or less connection with the general matters committed by law to his control or supervision. * * * In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry to a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint."

The court in Standard Nut Margarine Co. of Florida v. Mellon et al., 63 App.D.C. 339, 72 F.2d 557, 559, in applying the rule to the Secretary of the Treasury and the Assistant Secretary of the Treasury, said:

"Notwithstanding this fact, however, we are of the opinion that the defendants are not personally liable in damages for their erroneous construction and application of the statute. We think the case is governed by the rule that the head of an executive department of the United States government cannot be held in damages for acts done by him in relation to matters committed by law to his control or supervision. It became the official duty of the Commissioner to determine whether the product manufactured by the plaintiff was subject to the tax prescribed by the act. It is true that the Commissioner construed the statute erroneously, but nevertheless the subject-matter of the assessment was within his jurisdiction and authority. In such case error on his part does not expose him to an action for damages, and this is none the less true even though his error be described as arbitrary, capricious, and malicious."

Members of the Securities and Exchange Commission were defendants in the case of Jones v. Kennedy et al., 73 App.D.C. 292, 121 F.2d 40, 42, and concerning the rule of immunity the court made this statement:

"We consider first those allegations which are based upon the actions of the defendants in connection with the investigations, stop order proceedings, and presentation of evidence to a grand jury. At the outset we call attention to the established law that public officers when acting within the scope of their official authority are immune from suits for damages. It is not necessary to outline again the development of, and merit in, this principle. The plaintiff recognizes the doctrine and accepts the challenge of showing acts which fall outside of the immunity."

In Phelps v. Dawson, Commissioner of Insurance within and for South Dakota, et al., 8th Cir., 97 F.2d 339, 340, 116 A.L.R. 1343, the Eighth Circuit Court of Appeals, said:

"The question here is whether a deputy Fire Marshal in making such a charge (if he was of the opinion that there was sufficient eviden.'e to charge any person with arson) is liable for damages if he does so without probable cause and with malice. The answer must be that he is not. The reason is that, in instituting such a charge, he is acting in a so-called quasi-judicial capacity connected with the enforcement of the criminal law. Broadly speaking, it is his official duty to institute such proceedings. His action in so doing is, under the statute, to be the result of his honest judgment based upon the results of his investigation. He has a choice—sometimes called a 'discretion'—to initiate or not to initiate such a criminal proceeding. The public welfare requires that this choice shall be free of all fear of personal liability. To assure this freedom of action it is deemed best to make that assurance positive and definite by securing him against even actions based upon a malicious abuse of his official power."

In Cooper v. O'Connor, 69 App.D.C. 100, 99 F.2d 135, 141, 118 A.L.R. 1440, immunity was extended to the Comptroller of the Currency of the United States, Receiver of the Commericial National Bank of Washington in the District, General Counsel for the Comptroller of the Currency, Deputy Comptroller of the Currency, United States Attorney and Assistant United States Attorney, upon a finding that these officers were acting within their authority. The court in the Cooper case discusses the de-

velopment of the immunity of federal officers and in its opinion said:

"In several of the cases in which the rule of immunity has been applied the rationalization used has been that the particular defendant was a judicial officer, or was engaged in a judicial determination, or was so closely associated with the judicial process as to make necessary his protection from harassment in order to protect the judicial process. It must be admitted that this rationalization does not apply with equal force to the appellees, other than Rover and Goldstein (United States Attorney and Assistant United States Attorney). * * *

"But whatever these considerations may indicate as to the wisdom of legislative limitation, the rule as now declared in many cases has been applied, not only to officials judicial and quasi-judicial, but to executive officers generally, * * *.

"The reason now given for the rule is simply one of public policy. 'Otherwise the perfect freedom which ought to exist in discharge of public duty might be seriously restrained, and often to the detriment of the public service.' De Arnaud v. Ainsworth, 24 App.D.C. 167, 178, 5 L.R.A.,N.S., 163. See also, United States to Use of Parravicino v. Brunswick, 63 App.D.C. 65, 68, 69 F.2d 383, 386. As was pertinently said in an English case: ' * * * Does an action lie against a man for maliciously doing his duty? I am of opinion that it does not; * * *' Dawkins v. Paulet, L.R. 5 Q.B. 94, 114."

For other cases holding the rule applicable see, Brown v. Rudolph et al., 58 App. D.C. 116, 25 F.2d 540 (The Commissioners of the District of Columbia); Lang v. Wood et al., 67 App.D.C. 287, 92 F.2d 211 (Members of the United States Parole Board, the Parole Executive, the Warden of a Federal Penitentiary, the Director of the Bureau of Prisons); and Adams v. Home Owners' Loan Corporation et al., 8th Cir., 107 F.2d 139 (Home Owners Loan Corporation).

As seen from the cases above cited the rule of immunity is founded upon considerations of sound public policy. At the time these defendants held their positions under the Selective Service System, public policy demanded that they have a free hand in the execution of their duties prescribed by the Selective Training and Service Act, 50 U.S.C.A.Appendix, §§ 301 to 318, and that they not be restrained in the expeditious discharge of their duties by the fear of civil suits for damages being instituted against them by registrants who felt that they had been wrongfully classified. When the Selective Training and Service Act of 1940 was enacted this Nation's very existence was at stake, and although at this late date, when the war has been brought to a successful conclusion, we may tend to forget the graveness of the situation then confronting our Nation, there did exist a very real danger. Congress, being aware of this, declared that it was "imperative to increase and train the personnel of the armed forces of the United States," and these defendants were an integral part of the process whereby our manpower was to be mobilized with the greatest possible speed.

The classification of any particular individual was to be completed within the framework of the Act, and no judicial review of that classification was provided. Section 10(a) (2), 50 U.S.C.A.Appendix § 310(a) (2), states that the "decisions of such local boards shall be final except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe." In regard to this provision Mr. Justice Douglas, in delivering the opinion of the court in Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 427, 90 L.Ed. 567, said:

"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes."

As the law stands at the present time, judicial review of the action of the draft board may be had in two situations: (1) By writ of habeas corpus after actual induction into the armed forces, and (2) upon the trial of a registrant for a violation of Section 11 of the Act. The latest announcement by the Supreme Court, Cox v. United States, 332 U.S. 442, 68 S.Ct. 115,

limits the scope of that review to an examination by the trial judge of the draft board's file to determine if there is a basis in fact to support the classification.

When the conditions and circumstances surrounding the Selective Service System are considered: The national emergency; the need for drastic and effective action in mobilizing our manpower; the broad powers granted the agencies charged with carrying out the purposes of the Act; the very limited scope of judicial review; the uncompensated services rendered by these conscientious citizens (members of the Local Boards and Appeal Boards); and the obvious need for free and unrestrained action on the part of the men responsible for the accomplishment of the desired results, it becomes apparent that public policy demands that men in the position of these defendants be accorded the protection of the rule of immunity from civil liability for acts performed by them within the scope of their authority.

The court does not wish to labor this point, especially since the plaintiff seemingly does not contest it, but in view of the importance of this conclusion, and the possible ramifications of a contrary result, the court felt justified in fully developing the point.

 The allegation in the complaint that the defendants here are sued individually does not remove them from the protection of the rule of immunity, since it is not denied, and, in fact, the complaint alleges that at all times material herein the defendants were duly qualified and acting in their designated capacities. As stated by the court in Laughlin v. Rosenman et al., App.D.C., 163 F.2d 838, 843:

"The application of the rule of immunity cannot be avoided by the allegation of the plaintiff that the defendants are sued in their personal capacities."

See, also: Cooper v. O'Connor, supra.

Having decided that the rule is applicable to these defendants if the acts complained of were within the limits of their authority, it becomes important to determine whether the defendants were acting within the scope of their authority.

The learned attorneys for the plaintiff concede this to be the major question for the determination of the court and on page 20 of plaintiff's brief state:

"Plaintiff bases his position on the fact that the defendants herein acted entirely outside the scope of their authority, and therefore that the question of scope of authority is the only one of importance here. Distinctions as to the nature of the defendants' duties, whether or not they were in good faith, and whether or not they were acting under an innocent mistake of law are not relevant to the issue here raised."

And on page 25 of the brief they state:

"The consideration of the liability of administrative officers for acts committed in excess of their authority brings the Court in this case finally to necessity of determining whether the facts alleged in the complaint show that the draft boards acted in excess of their authority. It is respectfully submitted that the allegations, both of fact and of conclusions, cannot be questioned."

Section 10(a) (2), 50 U.S.C.A.Appendix, § 310(a) (2), of the Selective Training and Service Act provides in part as follows:

"Such local boards, under rules and regulations prescribed by the President, shall have power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized all questions or claims with respect to inclusion for, or *exemption* or deferment from, training and service under this Act of all individuals within the jurisdiction of such local boards." (Italics added.)

Section 601.128, Code of Federal Regulations, 1940 Supplement, Title 32, Chapter VI, reads in part as follows:

"Jurisdiction. The jurisdiction of each local board shall extend to all persons registered in, or subject to registration in, the area for which it was appointed, and to all persons whose registration cards are duly transferred to it. *It shall have full authority to do and perform all acts authorized by the selective service law.* * * *" (Italics added)

Section 601.140 reads in part:

"Jurisdiction. Each board of appeal shall have jurisdiction to review any decision concerning the classification of a registrant by any local board in the area of the board of appeal, and to affirm, modify, or reverse the decision, provided that an appeal has been filed with the local board. It shall have the same appellate jurisdiction to review any decision on classification submitted to it by another board of appeal for review. The decision of the board of appeal shall be final, unless modified or reversed by the President. * * *"

Section 603.326 reads in part as follows:

"Responsibility of local board. (a) * * * It is the local board's responsibility to decide in the first instance in which class each registrant should be placed. This should be accomplished so as to give equal and fair justice to all. The entire administration of the selective service law shall be impartial and free from any political influences. There shall be no discrimination for or against any person because of his race, creed, or color, or because of his membership or activity in any labor, political, religious, or other organization.

"(b) Classification is the key to selection, and it must be accomplished in the spirit of the Selective Service Act, in the preamble of which Congress has declared 'That in a free society the obligations and privileges of military training and service should be shared generally in accordance with a fair and just system * * *.'"

Section 603.370 provides in part:

"Who may make appeal to board of appeal. The registrant, any person who claims to be a dependent of the registrant, a government appeal agent, the Director of Selective Service, or the State Director of Selective Service may appeal to the board of appeal from any local board classification, except that no appeal may be made by, or on behalf of, a registrant classified in Class II or Class III who claims a lower classification. * * *"

Section 603.379 sets out the conditions precedent to an appeal to the President.

Section 5(d), 50 U.S.C.A.Appendix, § 305(d), of the Selective Training and Service Act provides:

"Regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service (but not from registration) under this Act."

It is under this section that the plaintiff based his claim for exemption.

The plaintiff made full use of the classification machinery provided by the Selective Service System. He registered and claimed classification of IV-D; the local board classified him 1-A; and he duly appealed to the Board of Appeal, where the classification of the Local Board was reversed and he was placed in class IV-E. His request to appeal to the President was refused, but such an appeal is not guaranteed and lies only in certain cases.

For the purpose of ascertaining whether acts are within the scope of official authority, no exact criterion has been or can be devised. It seems sufficient if they have "more or less connection with the general matters committed by law to his control or supervision," Spalding v. Vilas, supra, or "in relation to matters committed by law to his control or supervision," Standard Nut Margarine Co. v. Mellon, supra, or "done within the scope of the officer's duties as defined by law," Cooper v. O'Connor, supra. However, the instant case seems clearer yet, for the Selective Training and Service Act provides " * * * local boards * * * shall have power * * * to hear and determine * * * all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this Act * * *." There is no ambiguity in this provision giving the draft board authority to pass on all questions or claims with respect to exemption.

Accepting here as true the present allegation that the plaintiff is a bona fide minister, still the assertion of such claim in his questionaire did not automati-

cally exempt him from service, nor relieve the defendants from doing their official duty and from exercising their discretion and from officially classifying him. As stated by the court in United States ex rel. Goodman v. Hearn, 5 Cir., 153 F.2d 186, 187:

"The regular minister or theological student has no inherent or constitutional right to exemption from service. The exemption is given by Congress, and is subject to the qualifications that Congress may annex to it. All are required to register."

The burden is upon the plaintiff to bring himself under the exemption. This burden is not satisfied until he has convinced the draft board that he is such a minister as was intended by congress to be exempt, and congress has invested in the local draft board, and the board of appeals, the authority and the duty to make this determination. In this regard the court in Harris v. Ross, 5 Cir., 146 F.2d 355, 357, said:

"One who, in actuality, is a regular minister of religion is exempt under the act from military service, but the actuality and the regularity of his functioning as a minister is a question of fact, the burden of proving which is on the registrant, and the duty of passing on which is, with finality, vested in the local board, subject to rights of appeal. Congress exempted from liability to military service one who is a regular minister of religion, but the Act vested the local board with the duty and discretion to determine whether as a matter of fact a registrant is a regular minister. Immunity from the general obligation of service will never be presumed. The burden of proof is on him who seeks to bring himself within the exemption and outside the scope of the universality of the duty to serve in the armed forces."

The plaintiff relies strongly upon the language used in the opinion of the Supreme Court of the United States in Estep v. United States, supra, in which the court said:

"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review that obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. *The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant.*" (Italics added)

Relying upon the above statement by the Supreme Court the plaintiff contends that the defendants had no jurisdiction to classify him other than as a minister of religion, and that their act in refusing such classification was arbitrary and without basis in fact and thus beyond their jurisdiction, and having acted outside their jurisdiction, they are removed from the rule of immunity and therefore subject to his present claim for damages.

Prior to the Estep decision, and particularly after the Falbo decision, Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305, the Circuit Courts of Appeals had consistently held that at the trial of a registrant for an alleged violation of Section 11 of the Act the defense of a lack of jurisdiction on the part of the local board in making the classification was not available to one accused of such a violation. In view of the provision of the Act making the decisions of the local boards final, subject of course, to the right of appeal to the appeal board and in certain cases to the President, the only means by which a review of a classification could be had was by way of habeas corpus after induction into the armed forces or after reporting to and being accepted by a civilian public service camp. The decision in the Estep case changed this, a majority of the court feeling that an accused was denied due process of law when he was not accorded the right to prove that his prosecution was based on an invalid order of the draft board. Thus, it appeared that one in the position of the plaintiff in the instant case had two methods whereby review of his classification could be had, one available in a trial for an alleged violation of Section 11 of the Act, and one available after reporting to and being accepted by a civilian public service camp (habeas corpus).

Of course, it was a pre-requisite to the availability of either that the administrative process be exhausted. Falbo v. United States, supra. Then, in Gibson v. United States, 329 U.S. 338, 67 S.Ct. 301, 312, 91 L.Ed. 331, doubt was cast on the availability of relief by way of habeas corpus, and in its opinion the court said:

"The Government concedes that Congress intended some remedy to be available. We know of no way by which this can be assured, in such a case as Gibson's otherwise than by permitting the defense to be raised in the criminal trial."

Subsequently the Cox case, Cox v. United States, supra, determined that the scope of the review shall be an examination of the file by the trial judge to ascertain if there be a basis in fact for the decision of the board.

The language concerning "jurisdiction" employed by the court in the Estep case was directed at the problem then confronting the court, that due process of law demanded that the accused have the opportunity of showing, in the manner prescribed later by the Cox case, a lack of that "jurisdiction" that is required by due process to support an order, the violation of which may subject the violator to confinement in the penitentiary.

The term "jurisdiction" is given various meanings and is an ambiguous term at best, but for the purpose of granting these defendants the protection of the rule of immunity, they were acting within the scope of their authority or "jurisdiction." By the terms of the Act and the regulations thereunder, these defendants had authority to determine the plaintiff's classification. Having that authority they could classify the plaintiff according to their considered judgment. If, after the claim of the plaintiff was considered, they acted without any basis in fact in making the actual classification, then they exceeded their "jurisdiction" as that term was used in the Estep case, and due process requires that one be allowed to make this showing, within the limits of the Cox case, at his trial for an alleged violation of Section 11 of the Act, in order to prevent conviction when prosecution is based upon an invalid order of the draft board, there being no "basis in fact" for the board's classification. However, in the instant case, the fact remains that the defendants were acting within the scope of their authority or "jurisdiction" for purposes of the rule of immunity, even though they conceivably exceeded their "jurisdiction", as alleged by the plaintiff, for purposes of punishment for an alleged violation of Section 11. The Estep case does not compel a contrary result.

Concerning this point the court in United States v. Rinko, 7 Cir., 147 F.2d 1, 3, said:

"Defendant urges that the local board was without jurisdiction to classify him in 1–A for the reason that he was a minister of religion and, therefore, in a class of exempt persons. In support of this assertion he urges that the evidence before the board was conclusive on this subject and permitted of but one classification—that of minister of religion. The contention of 'lack of jurisdiction' is, of course, an erroneous one and a misuse of the term 'jurisdiction.' The Board without question had authority to pass upon defendant's classification, and if in so doing they erred, that is not to say that they lacked jurisdiction. Possessed of the authority to act, they, of course, could act in any manner that met with their considered judgment. They were not required to adopt defendant's view that the evidence only warranted one classification. If, however, they erroneously classified defendant a method is provided for review; * * *"

The court realizes that the decision of the Rinko case has been in effect overruled by the Estep case, but the above reasoning is sound for the point covered, and is approved by this court.

The remaining arguments of the plaintiff have been considered and need to be referred to only briefly. On page 36 of his brief it is stated:

"Plaintiff here says that it should be the duty of this court to examine the question independently and pass upon this point as though the Supreme Court of the United States had never decided the matter. This court is entitled to make a fresh examination and decision of the same questions of

law subject to its own discretion and judicial authority."

The plaintiff bases the above upon the fact that the opinion of the court in the Cox case was the opinion of four judges merely, Mr. Justice Frankfurter concurring. The effect of the Cox case, as viewed by this court, has been heretofore set out, and were the court confronted with the question it would follow the "basis in fact" examination laid down therein.

On page 39 of plaintiff's brief it is stated:

"The draft board determination is not protected by any stronger shield in a damage action than it is in a criminal prosecution. The action of the defendants is open to attack in this case if their action is not impervious in the criminal proceedings. In other words if there is no basis in fact for the denial of the claim for exemption in the criminal case then there is no basis in fact for it in this action for damages."

The holding of the court in the Estep case was limited to the proposition that it dealt with, and did not purport to throw the field of review of the draft board's decisions wide open. The requirements of due process in a trial for an alleged violation of Section 11 of the Act cannot be extended to guarantee every aggrieved registrant a cause of action for damages. No authority for such a contention exists and public policy forbids the extension of the requirements of due process to the extent urged by plaintiff.

In his complaint the plaintiff apparently is attempting to state a claim under Sections 43 and 47 of Title 8 U.S.C.A. This claim was not urged in his formal brief, but subsequent to the filing of his brief, one of the attorneys for plaintiff by letter referred the court to the case of Picking et al. v. Pennsylvania R. Co. et al., 3 Cir., 151 F.2d 240, taking the position that this case supports his claim under the above named Sections of Title 8.

■ In the Picking case one cause of action was based upon Section 43 of Title 8 U.S.C.A., and the Circuit Court of Appeals for the Third Circuit held that for purposes of a motion to dismiss the allegations in the complaint supported the alleged cause of action. The allegations in the complaint were sufficient, as against attack by a motion to dismiss, to bring the defendants within the terms of Section 43 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, * * *"). It was further held that under Section 43 official acts were not privileged if they deprived one of his federal rights. The facts of the Picking case vary materially from those of the instant case. It is not contended by this plaintiff, nor could such a contention be seriously made, that the acts of these defendants constituted action "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" as contemplated by Section 43.

■ Neither do the allegations in plaintiff's complaint state a claim upon which relief could be granted under Section 47. Probably the plaintiff relies upon Subsection (3) of Section 47, which concerns a conspiracy of two or more persons " * * * depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; * * *." Concerning Section 47, the Eighth Circuit Court of Appeals in Love v. Chandler et al., 124 F.2d 785, 786, said:

"The statutes which the appellant seeks to invoke were passed shortly after the Civil War to aid in the enforcement of the Thirteenth Amendment abolishing slavery, the Fourteenth Amendment prohibiting State action the effect of which would be to abridge the privileges or immunities of citizens of the United States or to deprive any person of life, liberty or property without due process or to deny any person the equal protection of the law, and the Fifteenth Amendment prohibiting the denial of the right to vote on account of race or color. * * * *The statutes were intended to provide for redress against State action and primarily that which discriminated against individuals within the jurisdic-*

*tion of the United States. * * *"* (Italics added)

As stated before it is not and could not be contended that the acts of these defendants constituted "state action" as contemplated by the Fourteenth Amendment to the Federal Constitution. For cases construing Section 47 see: Mitchell v. Greenough et al., 9 Cir., 100 F.2d 184; Laughlin v. Rosenman, supra. For a recent Supreme Court case discussing "state action" see: J. D. Shelley et ux. v. Louis Kraemer et ux., Orsel McGhee et ux. v. Benjamin J. Sipes et al., 68 S.Ct. 836.

■ Charges of arbitrary, capricious and malicious action do not aid the plaintiff in his claim for damages. The defendants were acting within the scope of their authority and are protected whether or not they acted arbitrarily or maliciously. A contrary result would defeat the rule of immunity. Since public policy dictates that these defendants be immune, the immunity, within its proper sphere, must be absolute. See: Spalding v. Viles, supra; Standard Nut Margarine Co. of Florida v. Mellon et al., supra; Phelps v. Dawson, supra; Cooper v. O'Connor, supra; Lang v. Wood, supra; and Laughlin v. Rosenman, supra.

Judgment is being entered today sustaining the motion to dismiss and dismissing the complaint, and the exceptions of the plaintiff are noted.