**UNITED STATES of America**

v.

**Jack Ronald CAPEHART.**

**No. A-6710.**

United States District Court
N. D. West Virginia,
Wheeling Division.

May 29, 1956.

John R. Morris, U. S. Atty., Clarksburg, W. Va., R. J. Schleuss, Asst. U. S. Atty., Fairmont, W. Va., for plaintiff.

Victor F. Schmidt, Columbus, Ohio, Horace S. Meldahl, Charleston, W. Va., for defendant.

BOREMAN, District Judge.

An indictment was returned by the grand jury for the Northern District of West Virginia on the 6th day of April, 1954, against the defendant, Jack Ronald Capehart. Count No. 1 was dismissed on motion of the defendant with consent of the United States Attorney. Count No. 2 of the indictment, with which we are concerned, charged that the defendant, having been classified by Local Board No. 2, Selective Service System, Cabell County, Huntington, West Virginia, as a conscientious objector and found fit for general service, did knowingly and wilfully fail, neglect and refuse to perform civilian work of national importance at Weston State Hospital, Weston, West Virginia, after having been notified to report for and perform such work by order dated the 19th day of August, 1953, in violation of Title 50, Appendix, Section 462(a), United States Code Annotated.

The defendant filed his motion to dismiss the indictment and discharge him on the ground that he had been deprived of a speedy trial to his prejudice, in violation of the Sixth Amendment to the Constitution of the United States, Rules of Criminal Procedure 48(b), 18 U.S. C.A., Article 3, Section 14, of the Constitution of the State of West Virginia, and Chapter 62, Article 3, Section 21 (6210), of the Code of West Virginia. This case was called for trial on January 24, 1956, and the motion to dismiss was overruled since the defendant had made no affirmative request or demand for trial at any time between the finding of the indictment and the trial date. By consent and agreement, the case was tried before the Court in lieu of a jury.

Following the presentation of evidence, the defendant filed a written motion for judgment of acquittal, the grounds assigned in support of such motion being briefly outlined as follows:

(1) and (2) There was no evidence that defendant is guilty as charged, and the Government failed to prove a violation of the Act and the Regulations;

(3) The Local Board refused to classify the defendant as IV–D, contrary to the definition of a regular and duly ordained minister of religion, the denial of the ministerial classification being illegal, arbitrary and capricious because the Local Board employed artificial standards in determining what constitutes a minister of religion;

(4) The Local Board prevented the defendant from having a fair hearing

when he appeared on October 29, 1951, because the Board repeatedly stopped the registrant, in violation of the Fifth Amendment to the Constitution of the United States;

(5) The Local Board would not hear the registrant in his explanation of the law relative to the exemption of ministers, in violation of Section 1624.2 of the Regulations and in violation of "Procedural Due Process", as guaranteed by the Fifth and Sixth Amendments to the Constitution of the United States;

(6) The Local Board at the hearing on October 29, 1951, acted upon its own standard "as what constituted a minister as one who preached from the pulpit and earned his own living from the ministry", repeating the charge that the Local Board would not listen "to the correct statement of the law in the hands of the registrant", all in violation of Sections 1624.2 and 1622.43 of the Regulations;

(7) At the hearing on October 29, 1951, the Local Board asserted that it had not granted any of Jehovah's Witnesses a IV-D ministerial classification and it never intended to do so in the future, thus indicating prejudice and discrimination against the defendant, in violation of Section 1622.1(d) of the Regulations;

(8) The Local Board failed to post, conspicuously in its office, the names and addresses of advisors to registrants, in violation of Section 1604.41 of the "Rules of the Selective Service System".

Although no request was made, the Court has deemed it necessary, in fairness to the defendant, to fully recite the facts, the procedural steps taken, the claims made by the defendant, and the conclusions of law, all of which follow.

Defendant was registered with Local Board No. 2 at Huntington, Cabell County, West Virginia. He was born on July 17, 1928, and on May 16, 1949, he being then twenty years of age, filed his classification questionnaire in which he stated that, by reason of religious training and belief, he was conscientiously opposed to participation in war in any form; that he was a minister of religion; that he was regularly serving as a minister; that he had been a minister of Jehovah's Witnesses since August 24, 1940, having been formally ordained on that date. His questionnaire stated that he was then employed by the Chesapeake & Ohio Railway Company as a stenographer-clerk, doing clerical, typing and shorthand work, having been so employed for three and one-half years; that he worked on an average of forty-four hours per week, earning $9.70 per day; that he did not expect to continue indefinitely at that job but expected to enter the full-time ministry. Under Series VIII, "Present Occupation", line 7, appears the following: "Other business or work in which I am now engaged is ministry".

With the classification questionnaire, defendant filed with the Local Board a paper bearing twenty-seven signatures, certifying as follows: "That we, the undersigned, witness the fact that Jack Ronald Capehart is an Ordained Minister of the Gospel and that he regularly and customarily preaches and teaches the word of God as set forth in the Bible". The defendant filed at the same time additional information in writing, from which is quoted the following: "I have been engaged in ministerial work since 1940. My ministry work consists of preaching and teaching the word of God as set forth in the Bible and doing so publicly and from house to house * * *. My ministry work also consists of making return calls on interested persons and holding home Bible studies with them if they so desire * * *. I also hold a special position in the Organization and give personal counsel relative to it and other matters pertaining to preaching the Gospel from the platform at our Company meetings. Also, I am enrolled in a ministry school in the organization, in which we make a thorough study of the different books of the Bible, as to who wrote them, the time of writing, etc. I average around 100 hours each month in the ministerial work. I am a Minister of the Gospel and partici-

pate in the ministerial work because it is the most important and joyous occupation one could be engaged in. I enjoy being a minister and do this work because I rejoice in helping others to become better acquainted with their Bible * * *. I am enclosing an identification card issued by the Watchtower Bible and Tract Society, 117 Adams Street, Brooklyn 1, N. Y., identifying me as an Ordained Minister of the Gospel".

On May 23, 1949, defendant filed a special form claiming exemption as a conscientious objector, in which he stated that he became a member of Jehovah's Witnesses about 1935 at Huntington by attending Bible studies with his mother; that he had studied with other Jehovah's Witnesses at their local Kingdom Hall; that he had studied the Bible at home and proved facts for himself; that he had given constant public expression to his views "by ministering to the public from door to door in Huntington and vicinity". He further stated that he had worked since 1944, first, as a machinist apprentice for the C. & O. Railway Company at Huntington, West Virginia, next as an equipment installer for Western Electric Telephone Company and, from 1945 to the time of filing this special form, as a stenographer for the C. & O. Railway Company.

Under Series IV, question 2(d), the following appears in the printed form: "Give the name, title and present address of the pastor or leader of such church, congregation or meeting". The answer given was "Kenneth B. Reed— company servant of Huntington company of Jehovah's Witnesses". Attached to the special conscientious objector form was a separate sheet which contained the following typewritten paragraph: "The Selective Service National Headquarters has determined that Jehovah's Witnesses and the Watchtower Bible and Tract Society constitute a recognized religious organization, and that all of Jehovah's Witnesses who are regularly and customarily teaching and preaching the doctrines of the Bible as advocated by Jehovah's Witnesses are entitled to exemption as ministers of religion". This was followed by another statement: "I claim neutrality and the rights of neutrals because of my status as a minister".

On May 24, 1949, the Local Draft Board, by unanimous vote, classified the defendant as a conscientious objector, Class IV–E. On June 2, 1949, the Board was notified that registrant desired to appeal from the Board's classification and defendant's file was shortly thereafter forwarded to the Appeal Board. On September 17, 1949, the Appeal Board determined that defendant should not be classified in either I–A–O or IV–E, and the case was referred to the Department of Justice for investigation. The defendant appeared before a Hearing Officer of the Federal Bureau of Investigation on February 9, 1950, and was examined at length. The written report of the Hearing Officer discloses that the defendant was then employed by the C. & O. Railway Company at Huntington; that he became a member of the sect known as Jehovah's Witnesses in 1935, when he was about seven years old, and was brought up in its teachings by his mother; that, "as all of these people do, he claims to be a Minister of the Gospel and * * * in his examination before your Hearing Officer, he insisted that he should have been placed in Class IV–D as a minister". He was examined at length as to his conscientious objection to warfare and the report of the Hearing Officer indicates that the defendant was not familiar with a number of well known Biblical stories. However, the Hearing Officer reported that he was satisfied that the registrant was sincere in his views relating to warfare and that an FBI investigation supported this view for a number of persons had been interrogated. The Hearing Officer recommended that the defendant be classified as IV–E.

On October 24, 1949, the Appeal Board continued the defendant in Class IV–E. On March 7, 1951, through some error, the Local Board changed defendant's classification from IV–E to III–A, but

subsequently, on October 18, 1951, corrected its mistake and classified defendant in Class I-O (conscientious objector available for civilian work contributing to the maintenance of the national health, safety or interest). At defendant's request, the Local Board granted him a personal appearance hearing on October 29, 1951. At the conclusion of the hearing, the Local Board continued defendant's classification as I-O by a vote of 3 to 0.

The defendant's Selective Service System file was introduced in evidence at the trial. This file contains a record of the hearing before the Board at which time the defendant requested a minister's classification of IV-D. It appears from the record that the Board inquired if the defendant had a church of his own in which he preached, and he replied that he did not but did other work, such as passing out literature on the street and teaching. He was then asked how many ministers they had in his church and he replied, "he didn't know, that all of them were ministers of the gospel". The Board told him that its members considered a deacon or elder in a Baptist, Methodist or Presbyterian Church as doing that kind of work, and if they gave all of Jehovah's Witnesses a IV-D classification, they would feel they should give all deacons and elders the same classification. The defendant asked permission to read some of the Supreme Court decisions involving Jehovah's Witnesses but Mr. Keadle (a Board member and a reputable lawyer of the City of Huntington) told him that he would be glad to sit and talk to him all day but other registrants were waiting to make personal appearances.

The record of the hearing discloses that the defendant was of the opinion that the Board was prejudiced against Jehovah's Witnesses. He was informed that the Board was not prejudiced but "according to their interpretation of the Selective Service Laws, a 4-D classification was for a minister who preached for a church or congregation as their minister and received pay for his services, or one who was in a recognized school preparing for the ministry". The record indicated that the Board had reviewed defendant's file, as appears from the following: "According to the information in Mr. Capehart's file, he works for the C. & O. Railway Company as Stenographer-Clerk at a salary of $275.-00 per month". The defendant was notified by the Board that he had a right of appeal, to which he replied that he would appeal, that he would never go into the service or into work contributing to the war, "that he would take his case to the higher courts who were not prejudiced against Jehovah's Witnesses and who had never decided a case against them".

Prior to the hearing, the defendant filed a supplementary information sheet dated October 16, 1951, wherein he described his occupation as a stenographer-clerk for the Chesapeake & Ohio Railway Company at Huntington, West Virginia, at a monthly salary of $275. Following this description was added, "Also Ordained Minister—Note: I spend evenings and week ends in ministry work". With the supplementary information sheet, defendant filed a letter addressed to the Board and six affidavits, the affiants being Jehovah's Witnesses. These affidavits contained statements to the same general effect that the defendant was recognized by the Watchtower Bible and Tract Society as an ordained minister of the gospel; that the defendant preached from house to house, conducted Bible studies in the homes and from the platform of the local Company of Jehovah's Witnesses. One affidavit stated that affiant was the assistant Presiding Minister to serve in the Huntington Congregation of Jehovah's Witnesses; that he worked daily with Jack Ronald Capehart in the organizational work, as well as ministerial work. In the letter hereinbefore mentioned, defendant called the Board's attention to certain court decisions and stated: "Aside from my ministerial work from house to house, etc., I have been specially appointed by the

Watchtower Bible and Tract Society to serve in the Huntington, W. Va., Congregation of Jehovah's Witnesses. I am an Assistant to the Presiding Minister or Company Servant, who is in direct charge of the activities of the Huntington Congregation of Jehovah's Witnesses. I also conduct one of the weekly Bible studies at our local Kingdom Hall at 301 Second Street, Huntington, W. Va. It is hoped that the above will enable you to properly classify me in IV–D, a Minister's classification".

On November 5, 1951, following the hearing on October 29, 1951, the defendant furnished to the Board a photostat copy of an order entered by the Clerk of the County Court of Cabell County, West Virginia, which order recited that Jack Ronald Capehart, a Minister of the Gospel, duly ordained by the Watchtower Bible and Tract Society, Brooklyn, N. Y., (Jehovah's Witnesses), "be and he hereby is, authorized to celebrate the Rites of Matrimony in all counties of the State of West Virginia". A letter from defendant asked that this document be placed in his file and advised that an appeal from his classification would reach the Board in two or three days. On November 7, 1951, the Board received a six-page letter dated November 5, 1951, requesting an appeal, requesting classification as IV–D and containing information for the use of the Appeal Board in determining his "case". One paragraph of the defendant's letter is quoted as follows: "I have served in special ministerial positions for the past two years by special appointment by the Watchtower Bible and Tract Society (Jehovah's Witnesses), a legal recognized religious organization. Capacities served in have been Territory Servant and Advertising Servant. Both of these ministerial positions are listed in Opinion No. 14 of General Hershey, which I have quoted, and are to be considered for classification as ministers. My present position is Accounts Servant, which is the same as an assistant to the Presiding Minister in the orthodox churches".

He purported to quote from General Hershey's Opinion No. 14, stating that the same was incorporated into State Director advice as follows: "Members of Jehovah's Witnesses, known by the various names of Servant to the Brethren, Company Servant, Assistant Company Servant, Back-call Servant, Territory Servant, Advertising Servant, Accounts Servant, Stock Servant and other servants, devote their time and effort in varying degrees to the dissemination of the tenets and beliefs of Jehovah's Witnesses. Often the Servants to the Brethren and the Company Servants are found to be devoting their lives to a work of ministry to the substantial exclusion of secular employment. In such cases, they may be considered for classification into Class IV–D as ministers of religion". The defendant, in his letter of November 5, 1951, states that he is the Accounts Servant; that he has charge of account records; that he is the Bible Study Instructor at the local Kingdom Hall each Wednesday evening; that he prepares and delivers talks at their various meetings; that almost every evening that is not spent at a meeting is spent in some phase of the ministerial work; that he does street witnessing on Saturday; that on Sunday he does preaching work from door to door and takes part in meetings at the Kingdom Hall; that just because he does secular work does not deny him the right to status as Minister of Religion.

On November 15, 1951, the Local Board received another letter from defendant, with which was enclosed a photostat copy of a certificate from T. J. Sullivan, who signed as "Superintendent of Ministers and Evangelists of Watchtower Bible and Tract Society, Incorporated". The certificate is dated November 9, 1951, and certifies, in effect, that the defendant is a duly Ordained Minister of Jehovah's Witnesses engaged in preaching and teaching the principles of this Society and administering the rites and ceremonies thereof in public worship; that he presently officiates as As-

sistant Presiding Minister of the Huntington, West Virginia, Congregation of Jehovah's Witnesses; that he also regularly and customarily engages in preaching the doctrines and principles of Jehovah's Witnesses as a Missionary Evangelist; that he is authorized to perform the ordinary rites and ceremonies, such as the baptismal ceremony, the burial ceremony, etc.; that, since March 22, 1949, he has been serving as Bible Study Conductor of the foregoing Congregation, in which capacity he presides over Bible studies at certain designated meeting places throughout the Congregation's assigned territory, and generally supervises the ministerial activities of Jehovah's Witnesses from such meeting places.

All of this additional information received by the Local Board following the October 29, 1951, hearing was transmitted by the Local Board to the State Director of Selective Service, and by the Selective Service Headquarters to the Appeal Board. The Appeal Board continued registrant's classification as I–O.

In February of 1952, the defendant addressed a letter to Major General Lewis B. Hershey and the State Director of Selective Service requesting that his case be reviewed by the President, and on February 29, 1952, the National Director of Selective Service gave notice of such appeal.

The "minutes of action upon appeal to the President by National Selective Service Appeal Board" showed that the defendant was classified I–O by a vote of 2 to 1 on June 18, 1952. On July 4, 1952, the defendant addressed another letter to Major General Lewis B. Hershey and the West Virginia State Director of Selective Service, insisting that he was then entitled to an appeal to the "Presidential Appeal Board" and calling attention to information contained in his file. On July 8, 1952, the Local Board was advised that the defendant's case had been appealed to the Presidential Appeal Board on February 29, 1952, that the appeal had been acted upon and that no further action would be taken.

On July 9, 1952, the defendant was ordered to report on July 22, 1952, for a physical examination. The defendant appeared and submitted to examination but there appears in his file a typewritten paper dated July 22, 1952, bearing his signature and as follows: "To whom it may concern: I am an Ordained Minister of Jehovah's Witnesses and should have a 4–D classification; nevertheless, I have been placed in classification I–O and ordered to take this physical examination. I am, therefore, submitting to this examination but I will not enter into military service, either combatant or noncombatant service, nor will I perform civilian work contributing to the maintenance of the national health, safety or interest, other than the secular work that I now perform as a stenographer and clerk for the Chesapeake & Ohio Railway Company, which work is done solely for the purpose of enabling me to continue in the ministerial work. I am an Assistant Presiding Minister of the Huntington, W. Va., Company of Jehovah's Witnesses by special appointment from the Watchtower Bible and Tract Society, of Brooklyn, N. Y. Acceptance of any type of work would hinder me in performing my ministerial duties".

The defendant was certified as physically acceptable and he was sent SSS form No. 152 upon which to indicate a selection of types of civilian work, but on August 11, 1952, the Local Board received a letter from the defendant dated August 9, 1952, in which he indicated that he would not accept any type of civilian work and that he would not fill out the form, stating "in addition to my ministerial activity, however, I am also engaged at the present time in secular employment as a stenographer and clerk for the Chesapeake & Ohio Railway Company. This work is done solely for the purpose of enabling me to continue in the ministerial work because Jehovah's Witnesses do not burden anyone down with the responsibility of providing for their material needs. If I was financial-

ly able, I would devote all my time to the ministerial work".

On December 10, 1952, the defendant appeared before the Local Board, a representative of the State Director of Selective Service being present, and the defendant was asked if he was familiar with Selective Service Regulations dealing with conscientious objectors, to which he replied that he was. The defendant stated that he had received information sent him by the Board as to different types of work he might perform in lieu of induction, but that he had refused to do any work. He was asked if he still was employed by the C. & O. Railway Company and he answered that he was. He was asked what his wages were and he replied that he worked five days per week at $14.55 per day. He was then asked if he still refused to do any type of work and he replied, "Yes, sir, I do".

Following the prescribed procedure, on August 19, 1953, the Local Board ordered the defendant to appear on August 31, 1953, for hospital work at the State Hospital at Weston, West Virginia, which is an institution operated and maintained by the State of West Virginia for the mentally ill. The defendant appeared at the Hospital pursuant to the notice but refused employment.

The Court further finds from the evidence that at defendant's hearing on October 29, 1951, the Local Board did not assert that it never intended, in the future, to grant any of Jehovah's Witnesses a IV–D ministerial classification, as charged by the defendant. The defendant testified at his trial that he was still working for the C. & O. Railway Company at Huntington approximately forty hours per week. Local Board No. 2 did not post in its office a list of the names and addresses of advisors to registrants, but advisors had been named and such list was on the desk of the Clerk. The defendant did not ask for such list although he must have been aware of the regulation with respect to such posting since he testified that he looked for but found no such list.

■■ The objects sought to be attained by the Selective Service Act were national defense and military preparedness. The assignment of conscientious objectors to work for the protection of the public health bears a real and important relationship to those objects. United States v. Hoepker, (United States v. Thomas, United States v. Smith), 7 Cir., 1955, 223 F.2d 921, rehearing denied July 14, 1955, certiorari denied 1955, 350 U.S. 841, 76 S.Ct. 81. The State Mental Hospital at Weston, West Virginia, to which the defendant was ordered to report for work, is an institution which has for its purpose the care and restoration of those in impaired mental health. The order of the Local Board requiring the defendant to report for work was clearly within the language of the statute and the regulations. Pormorski v. United States, 6 Cir., 1955, 222 F.2d 106, certiorari denied 1955, 350 U. S. 841, 76 S.Ct. 81.

The facts are clear that the defendant appeared at the Hospital to which he was assigned for work of national importance pursuant to the order of the Local Draft Board, but he refused to work. He based his refusal on the claim of his right to a ministerial classification, and the primary issue to be determined here is whether or not he was properly denied the classification of minister.

Pertinent provisions of the Selective Service Act of 1948, as amended, Title 50 U.S.C.A.Appendix, are as follows:

"§ 466. Definitions.

\* \* \* \* \* \*

"(g) (1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof

in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

"(3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization."

The Act also provides that the decisions of the Local Board "shall be final, except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe". Title 50 U.S.C.A.Appendix, § 460(b) (3).

■ The burden is on the claimant to prove himself to be within the group entitled to the ministerial classification. United States v. Simmons, 7 Cir., 213 F.2d 901, 903; United States v. Blankenship, D.C., 127 F.Supp. 760, 765.

In the case of Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 427, 90 L.Ed. 567, it was decided: "The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards, made in conformity with the regulations, are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant."

In 1947, the United States Supreme Court, in the case of Cox v. United States, 332 U. S. 442, 68 S.Ct. 115, 120, 92 L.Ed. 59, cited the Estep case with approval and, on the question of the right of judicial review, said: "Although we held in Estep that Congress did not intend to cut off all judicial review of a selective service order, petitioners have full protection by having the issue submitted to the trial judge and the reviewing courts to determine whether there was any substantial basis for the classification order. When the judge determined that there was a basis in fact to support classification, the issue need not and should not be submitted to the jury. Perhaps a court or jury would reach a different result from the evidence but as the determination of classification is for selective service, its order is reviewable 'only if there is no basis in fact for the classification' ".

Later, subsequent to the Estep and Cox decisions, the case of Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 154, 98 L.Ed. 132, was decided by the United States Supreme Court in November 1953, in which case the Court stated: "The principal and decisive issue before us is whether there was a basis in fact for denying Dickinson's claim to a ministerial exemption under § 6(g) of the Universal Military Training and Service Act, 62 Stat. 611, 50 U.S.C.Appendix, § 456(g)". The foot note on page 390 of 346 U.S., on page 154 of 74 S.Ct. in-

dicates that the title was changed from the "Selective Service Act of 1948" to the "Universal Military Training and Service Act" by 65 Stat. 75. The provisions of the Universal Military Training and Service Act, pertaining to the ministerial classification, are identical with the provisions of the Selective Service Act of 1948 hereinbefore quoted.

In the Dickinson case, the defendant had been denied a ministerial classification and was convicted in the lower court for refusing to submit to the Local Board's induction order. The Supreme Court reversed the conviction on the ground that there was no basis in fact for denying Dickinson's claim to ministerial exemption. In the case of Witmer v. United States, 348 U.S. 375, 381, 75 S.Ct. 392, 395, 99 L.Ed. 428, the Supreme Court cited with approval the Estep case and distinguished the Dickinson case, holding "the classification can be overturned only if it has 'no basis in fact' ". It follows that the denial of a requested classification is governed by the same rule. In the Dickinson case, the defendant, a Jehovah's Witness, originally claimed a IV–D or ministerial classification in 1948, shortly after he registered under the Selective Service Act. He stated in his questionnaire that he was a regular, but not an ordained, minister and was working forty hours a week as a radio repair man. From other documents submitted to the Board, it appeared that he devoted an uncertain number of hours a week leading two Bible study groups and several hours each week to preaching to the public. The Board classified him I–A in July 1950.

In the spring of 1949, Dickinson left his 40-hour a week job as radio repair man and was ordained as a minister. He began working as a fulltime Pioneer Minister, devoting 150 hours each month to religious work, conducting three or four meetings each week at a public hall. He also instructed prospective ministers, receiving no salary for his mis-

sionary or Company Servant work. He lived on $35 a month earned by his weekly average of five hours of radio repair work. This modest income, a very low monthly rental for an apartment, self-performance of household tasks and invitations to various private homes, enabled him to subsist. Despite this change in Dickinson's activities, the Board continued him in I–A.

The Supreme Court in the Dickinson case, 346 U.S. 394, 395, 74 S.Ct. 152, 156 stated: "The ministerial exemption, as was pointed out in the Senate Report accompanying the 1948 Act, 'is a narrow one, intended for the leaders of the various religious faiths and not for the members generally.' * * * Certainly all members of a religious organization or sect are not entitled to exemption by reason of their membership, even though in their belief each is a minister. * * * Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption."

The Dickinson case is clearly distinguishable on the facts from the instant case. Dickinson worked only five hours per week as a radio repair man after his ordination and after he began devoting practically his entire time to the performance of claimed ministerial duties. There was a material change in his manner of living, indicating an intention on his part to devote his full time to the ministry except the very few hours each week devoted to secular work in order to provide the barest necessities.

In the case here, Capehart claimed in his original classification questionnaire

that he had been a minister of Jehovah's Witnesses since August 24, 1940, apparently relying upon a formal ordination by baptism on that date when he was only twelve years of age. At the time of his registration, he was regularly employed by the Chesapeake & Ohio Railway Company, working on an average of forty-four hours per week and having been so employed for several years. He informed the Board that he did not expect to continue indefinitely at that job but expected to enter the fulltime ministry. However, at the time of trial, he was still employed by the Railway Company, working on an average of forty hours per week and earning considerably more than at the time of filing his classification questionnaire. This defendant claimed to be devoting approximately one hundred hours per month to religious work, but a portion of that time was spent in passing out literature on the street. In his personal appearance before the Local Board on October 29, 1951, Capehart was asked how many ministers there were in his church and he replied, according to the minutes of the Local Board, that "he didn't know, that all of them were ministers of the gospel". The defendant's own proof shows that his religious work was performed only part time, occasionally, and not even half time. He told the Local Board, "I am a Minister of the gospel and participate in the ministerial work because it is the most important and joyous occupation one could be engaged in. I enjoy being a Minister and do this work because I rejoice in helping others to become better acquainted with their Bibles".

 The record discloses that the defendant has fallen far short of making a prima facie showing that he should have been classified as a Minister, and his religious work did not, in accordance with the statute, comprise the defendant's "vocation". The defendant complains that the Local Board's denial of the ministerial classification was illegal, arbitrary and capricious; that the Local Board employed artificial standards

in determining what constitutes a minister of religion and acted upon its own standard "as what constituted a minister was one who preached from the pulpit and earned his own living from the ministry". It is true that the minutes of the hearing before the Local Board on October 29, 1951, contain the following: "According to their interpretation of the Selective Service Laws, a IV–D classification was for a minister who preached for a church or congregation as their minister and received pay for his services, or one who was in a recognized school preparing for the ministry". However, the same minutes show that the defendant was asked how many ministers there were in his church and he replied, in effect, that he didn't know and that all of the members of Jehovah's Witnesses were ministers of the gospel. The same minutes show that the Board considered the fact that the defendant worked for the C. & O. Railway Company as stenographer-clerk at a salary of $275 per month, thus indicating that the Board members felt that his work for the Railway Company was his real vocation. These minutes of the hearing, together with all information appearing in the defendant's file, were reviewed on the appeals, reference to which has been heretofore made. The classification of I–O, or conscientious objector, was approved at every step of the administrative procedure and the ministerial classification was denied. The State Appeal Board and the National Selective Service Appeal Board (Presidential Appeal Board) placed the defendant in Class I–O. The action of the Appeal Board completely superseded the action of the Local Board in classifying the registrant even though the classification was the same. Cramer v. France, 9 Cir., 148 F. 2d 801; Tyrrell v. United States, 9 Cir., 200 F.2d 8; Reed v. United States, 9 Cir., 205 F.2d 216. The allegations of the defendant as to prejudice of members of the Local Board, or antipathy to the religious sect of which the defendant was a member, even if sustained by proof, were not relevant after the Ap-

peal Boards had acted. Falbo v. United States, 320 U.S. 549, 555, 64 S.Ct. 346, 349, 88 L.Ed. 305 (concurring opinion of Mr. Justice Rutledge).

■ The defendant contends that he was denied a fair hearing before the Local Board because the Board would not permit him to cite and discuss certain court decisions touching upon his claim to a ministerial exemption. However, the record discloses that he was given a hearing and that the Local Board had before it a letter from the defendant in which he undertook to cite several pertinent court decisions. Selective Service Regulations 1624.2(b) provides: " * * * The member or members of the Local Board before whom the registrant appears may impose such limitation upon the time which the registrant may have for his appearance as they deem necessary".

■ The defendant complains of the failure of the Local Board to post, conspicuously in its office, the names and addresses of advisors to registrants. The Court has found, as a fact, that even though the list of the names and addresses of such advisors was not posted on the wall of the office of the Local Board, yet advisors had been appointed and a list of such advisors was on the desk of the clerk. The defendant testified that he looked for the posted list but failed to find it. Obviously, he was aware of the regulation with respect to such posting and the information was readily available to him through a simple request, which he did not make. In United States v. Manns, D.C.N.D.Ill.1955, 135 F.Supp. 624, 628, the Court cited with approval United States v. Dorn, D.C.E.D.Wis. 1954, 121 F.Supp. 171, and held: "The appointment of advisors is not such an inherent element of fair procedure that the failure to appoint and post them

automatically invalidates the proceedings."

The defendant, Capehart, followed the procedures available to him in an effort to secure the ministerial classification. He appealed from the decision of the Local Board even to the Presidential Appeal Board, and in each instance the classification accorded him by the Local Board was upheld. At every stage of the proceedings, the defendant made it known that he would not comply with any order of the Board which failed to recognize his claim to exemption as a minister. The defendant had collected and submitted to the Local Board affidavits, certificates and full and complete information concerning his claim to exemption. The record discloses that the Local Board had all of this information before it, and the same information was in his file when the case was reviewed on appeal. "The posting of advisors could not have affected the defendant's situation since, as he admits, he would refuse to perform any form of civilian work because it would interfere with his preaching." United States v. Manns, D.C., 135 F.Supp. 624, 628. Cf. Chernekoff v. United States, 9 Cir., 219 F.2d 721; United States v. Giessel, D.C., 129 F.Supp. 223; United States v. Rowton, D.C., 130 F.Supp. 189.

This Court is of the opinion that there was basis in fact supporting the defendant's classification as I–O and the denial of the ministerial classification of IV–D. Obviously, there was sufficient evidence in the defendant's Selective Service file upon which to base a finding that the defendant's vocation was not that of a minister of religion and that his religious activities were performed irregularly and incidentally. The defendant's motion for judgment of acquittal is denied. The Court finds the defendant guilty as charged in the second count of the indictment.